Peck, J.
delivered the opinion of the court.
The bill charges, that the elder Hadley departed this life about the 8th February 1830, intestate. That he was 77 years of age at the time of his death: for sever *538 al years before, circumstances had rendered Ms life unhappy, and had placed him m the hands of the designing and covetous, some of them enemies to himself and family, who practised upon his credulity and weakness. That said Hadley had separated from his wife; had discarded a son, a member of the bar, whom he charged as having conspired, with two other lawyers, to suffer them to injure him in an important law suit. On this subject he was deaf to reason, and rejected full and ample evidence of the groundlessness of the charge against his son; insomuch that upon that subject he was wholly deranged; he was a man of violent passions; and these became more ungovernable as his mind declined, which was rapid; his latter affliction was dropsy in the chest, which affected his brain. In this state of mind, and under the circumstances in which he had placed himself, to injure his family, he determined to convey away and squander his property. He resolved to free his negroes; not from conscientious scruples. From this he was restrained by the wife, who obtained an injunction on a petition for alimony. In March 1827, that case was disposed of; the wife was provided for, and as to the rest of his property, he was left to take his course.
Among pretended friends and advisers, was Latimer, the defendant; he exerted himself to prevent reconciliation with the family. The said elder Hadley first conveyed his home place, worth ‡3,000, to one Douglass, who was to provide for Mm during life, but to this he took no covenant; in a few months they fell out, and Hadley went to live with Latimer. Mrs. Latimer was the niece of Mrs. Hadley, and had been raised by Hadley; she was aimable, anda favorite with him. Latimer is charged with acting as agent and attorney in fact, was on all occasions his counsellor and adviser, adopted all his passions, and inflamed his hatred against his family and passed himself upon him as his only friend. They charge, that Latimer received much personal pro *539 perty into his hands of the estate of Hadley. Also, as agent, got money and other valuables to a large amount, which he has never accounted for, and procured two deeds for lands, one tract of 486 acres in Fayette, the other tract in the Western District for 243 acres. That he took a bill of sale for the negroes, (four in number, naming them) as for a valuable consideration in services rendered, when none had been performed. Notwithstanding the acts of Latimer, which were kept up to the end, the old man, as his dissolution drew near, became reconciled to his family, regretted his delusions, revoked all former wills, having made several, &c. The bill charges, that Latimer fraudulently conveyed the ne-groes into Illinois, a free state, with a view that they might be emancipated. Douglass gave up the home place, receiving ‡300. The bill prays an account, and that the deeds for the land and bill of sale for the negroes he cancelled and declared void, and the estate revested in the heirs and representatives, &c.
Latimer answers, that he married a niece, who had been the foster child of J. Hadley, and a favorite. That he himself had done many things for Hadley, and both himself and wife being poor, Hadley gave him a small tract of land seventeen or eighteen years ago, which he sold for $210; he lived twelve years beside said Hadley in friendship; for the last eight years he lived five or six miles off; admits the misunderstanding in the family of Hadley; that Mrs. Hadley went off with most of the household furniture, and the old man was left alone, and had not furniture to make him comfortable; denies positively that he, defendant, had any agency in creating the difference, or keeping it up after it had commenced; nor did he encourage the removal of Hadley to his house. The elder Hadley had tried his nephew, Joshua Hadley, Jun’r.; they disagreed. He then tried E. L. Douglass; they disagreed. So far from wishing to insinuate himself in the favour of the elder Hadley, with a view *540 to profit out of the estate, lie was instrumental and did bring about the regulation with Douglass, who was to provide for the old man and have the estate. Hadley moved to the house of respondent in the month of January 1829, brought with him some property, of value about-dollars, but all the property, not used by Hadley, was taken away by the young Hadleys, not excepting sundry-articles actually presented to Mrs. Lati-mer and others of the family by the elder Hadley. The respondent built a house for the old gentlman, and was otherwise at vast trouble and expense on his account; attended his stock and fed them, &c. &c. — his wife, a weakly woman, incumbered with a large family, did all her strength permitted to administer to the wants and comfort of the old man. The elder Hadley, in the latter part of the year 1829, visited his daughter Amelia, the only member of his family with whom he was not hostile; there he took sick and never returned. As an evidence of his feelings, as well toward his family as to respondent,he wrote these two letters to respondent:
“ October 4/A, 1829.
“Dear Sir: My not being able to write you, has made me uneasy on your account, knowing my children would endeavour to set me against you as they did in turning against me. I shall depend on you to act for me while all of them is striving to prevent it; you have been my friend and I will be yours. Phill can tell you about my health, and I shall be with you I hope shortly. Martin had no business to tell you James was to do the business at Carthage; any business in law cases, I will get them to do as other lawyers, and will pay them; the wound they have gave my feelings I never can forget. I hope to be with you shortly. I remain yours,
Joshua Hadley.”
“ October 2áth, 1829.
Dear Sir: You would be surprised to know how my *541 children speak against you, and by that means expect to beep me from doing any thing for you; to bring a suit against Douglass, they said it was necessary for me to dissolve my will, which I have done, and James Sanders was very active to induce me to dissolve the will, which I think was to keep me from giving you any property. I wish you to get some person to write a will; do it in a private manner, and I will sign it, to give you every thing I have: why I want it kept a secret is for them to carry on a suit against Douglass. I have got Benjamin Smith to write to you to come to Smith’s to let me know what was said when I made the deed, and the conditions on which I made it; do not fail coming with Phill. I have to send the patent of the land with James Holmes to Shelbyville, to he there on the trial in two or three weeks, and I want you to take it, and if you do I will give you a deed for it. I have told Phill what to tell you. I am yours, Joshua Hadeey.”
Answer further shows, that Hadley had from time to time divided his estate with his children, and had in the language of the elder Hadley, made them rich, retaining a small remnant. He was averse to slavery, and often expressed himself so; he had applied to the legislature and to the courts to have them freed, hut his applications had been denied; and hence it was he employed respondent to convey them to a free state, that they might he emancipated; and for this service gave him the balance of the Fayette land, 243 acres. Respondent did as he believed and was advised, all that was sufficient to free the slaves, and believes they are free; but if not free, they are his, respondent’s property. Respondent had received a conveyance for 243 acres of the Fayette lands for making partition of a large tract of 2430 acres amongst sundry claimants; these lands are worth about ‡2 per acre; the deed for 480 was made to him in his absence. Respondent, under special directions, sold a *542 tract of 200 acres in Smith county; and renders an account of what he received for it. The proceeds of the tract of land in Franklin, which he sold to Harris, was given him by Hadley, in consideration that he would adjust a controversy with Harris, respecting lands divided between them; to do this he had to travel five or six times a distance of one hundred miles, had much trouble and expense, and finally settled the business, and received the negro (mentioned in the bill) from Harris, and a note for one hundred dollars. Hadley intended to give him, defendant, the remainder of his estate, often expressed himself to that effect, and drew a will or wills devising it to respondent. There was no derangement in the mind of Hadley; he always had capacity to manage his business well, except at one short period he was afflicted with a rising or inflammation in his head, which passed off with the disease, and a deafness which attended it. He was in perfect mind when he executed the deed for the Fayette land. He had a good recollection, particularly of events long past; denies all improper influence over the elder Hadley in relation to the matters complained of; some of the negroes had strong claims upon Hadley for their freedom, on the ground of merit; denies fraud, deceit and combination. Such is a brief outline of the pleadings in this case.
The evidence bearing on the case, though it lies in a narrow compass, has by repetition been carried out to a most unreasonable length. Thirty or forty depositions have not only repeated, what five or six had proved as well, but they are loaded with much impertinent and irrelevant matter, making in the whole a most burthen-some record.
Have the complainants sustained their case by the proofs? They have proved the bad state of feeling between the elder Hadley and other members of his family, (Amelia excepted) and though it is unimportant to go into the cause of this misunderstanding, yet it may be re *543 marked, that from the whole evidence the court are not satisfied that the cause stated and dwelt upon in the bill is the only one; - connected with others,it may have had its influence, or rather been used as a pretext for resolving to discard his son. If other causes existed, and we are of opinion that in the mind of Hadley they did, then it follows, that the partial derangement, as to the particular subject of the suit spoken of in the bill, did not exist; indeed, upon the subject of the sanity of Hadley, at the time of executing the conveyances and bill of sale to Latimer, so far from it being established by the proof that insanity existed, we have' satisfactory proof to the contrary. Hadley was firm to his purposes in family matters; he was pretty absolute, especially in after life. That he conformed to the wishes of his children, previous to the misunderstanding spoken of, may be inferred from the fact that he had in a great measure parcelled out his estate amongst them; but when he became old, when he was deserted by all of his family, and divested of almost the whole of his property, he doubtless imbibed other views; there is abundant evidence to prove him estranged from most of them, for some cause. In the moments of gloom, which his desertion, his age and disease brought upon him, it was natural for him to seek new objects for his affection. He could not forget the wife of Latimer, an adopted child in his family; having lived near him for many years after her marriage with Latimer, and finally driven as it were to her house as an asylum in his old age, and in distress, was it reason able, with all her amiable qualities as proved by the witnesses, her obvious burthens and privations, incumbered as he found her, with a large family and little help, that while seeking for proper objects to bestow the little wreck of his estate upon, he should overlook her? We think not. Once fix the two facts, the soundness of Hadley’s mind, and his separation and estrangement from his family, and it is an argu *544 ment against weakness of mind, that he made the selection.
But supposing there was weakness of mind to a degree that might be operated upon by one having gained his confidence, did Latimer take any such an advantage of Hadley? We cannot find it in the proof. Where is the evidence in the large volume before us that brands Latimer with any such stain? Whatever, in the testimony of complainants, may seem to have a bearing that way, (if any does) it is more than met in the respondent’s proofs; few men have sustained a better character than creditable witnesses give him. The very acts performed toward Hadley by Latimer, seem from the proof, to have sprung rather from motives of benevolence and an accommodating spirit, than from any prospect of gain. In noticing this part of the proof, we are not to be understood as sanctioning the practice of introducing character in the pleadings and proofs in chancery. Lati-mer when assailed, felt it no doubt his right to resist imputation, and he has done so, but does not recriminate. We regret the introduction of a practice so reprehensible; a practice which as the case before us shows how far a party may depart from his supposed equity to become personal. In the selling of Hadley’s lands and freeing his negroes, there is no proof that Latimer prompted either act; in procuring compensation, particularly for conveying the negroes to a free state, Hadley, as in everything else, dictated the compensation. He procured Mr. Cage while Latimer was absent to draw the deed for the Fayette lands, which Hadley then executed.— Touching this part of the issue made by the pleadings, the evidence may be summed up in this; That Hadley was a man possessed of a mind strong for one of his age, fixed and determined in his purposes, and from the time of his residence with Latimer, disposed to better his condition by giving him the little estate he had retained to himself. The question so earnestly pressed, that Lat- *545 imer, standing in the relation of agent or attorney in fact as to most of the affairs of Hadley, could not purchase or receive the estate from him, will be next considered. And first, it may be remarked, that the class of cases most vigilantly guarded by this court, that of the trustee purchasing the trust property, does not apply where the cestui que trust himself, knowing the situation of the estate, sells or gives it' to the agent. It is said in Jeremy’s E. Ju. 393, “where the cestui que trust is capable of taking a part in the transaction, the trustee may make a bargain with him, or purchase under his authority, or with his sanction.” The most the court will do in such a case, is to watch with jealousy the transaction; and however jealous the court may be when the relation is established, and however disposed to set aside a contract suspicious in the eye of the law, still, when the agent or trustee can prove to the satisfaction of the court, after scrupulous examination of all the circumstances, that there was no fraud, no concealment, and no advantage taken, the court will not interpose. To do so, would be to assume, to judge and act for other men, where the conscience of no one is affected. Why then act to make void the assurances of Hadley? It is said he was old; that of itself will not do. He had a misunderstanding with his family; Latimer neither produced or fomented it. He was in a situation to be imposed upon by Latimer, he being at the time an agent; Latimer took no advantage of that situation. Aside from the fact that the plaintiffs have failed in their proof to make out the case in the bill set forth, the defendant, as to all material matters charged, has met and disproved them.
The letters of Hadley of the 4th and 24th of October 1829, are a volume in the case before us. 1st. All his children then considered him of disposing mind. 2d. The letters go far to show he was so, and in whose behalf that mind operated. 3d. While it proves the assi- *546 ¿Mity of his returning children, and their disposition to turn him from Latimer, it also proves how deeply he felt the force of obligation to Ms only friend, and how justice and gratitude, to the last, predominated over art. The decree must be reversed, and the bill dismissed at the cost of complainants.
Bill dismissed.