# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
November 8, 2000 Session

# IN THE MATTER OF:
# THE CONSERVATORSHIP OF ELLEN P. GROVES

**Appeal from the Chancery Court for Montgomery County**
**No. 98-03-0055    Carol Catalano, Chancellor**

---

**No. M2000-00782-COA-R3-CV - Filed February 11, 2003**

---

This appeal involves the conservatorship of an elderly widow. Both the widow's brother-in-law and a niece filed petitions in the Chancery Court for Montgomery County requesting to be appointed her conservator. Following a bench trial, the trial court determined that the widow was "competent" and, therefore, dismissed both conservatorship petitions. The trial court also disapproved the brother-in-law's accounting of his expenditures on the widow's behalf and directed the brother-in-law and his wife to return the widow's real and personal property to her. On this appeal, the widow's brother-in-law asserts that the trial court erred (1) by refusing to appoint him conservator, (2) by refusing to approve reimbursing him for his expenses in caring for his sister-in-law, and (3) by directing him to return his sister-in-law's real and personal property. We have determined that the evidence preponderates against the trial court's conclusions that the widow is not disabled and that she does not need a conservator. However, we have also determined that the trial court properly declined to reimburse the widow's brother-in-law for his expenses in caring for her and properly ordered him to return her real and personal property.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Vacated in Part**

WILLIAM C. KOCH, JR., J., delivered the opinion of the court, in which BEN H. CANTRELL, P.J., M.S., and PATRICIA J. COTTRELL, J., joined.

Landon W. Meadow and Bruce A. Kennedy, Clarksville, Tennessee, for the appellant, Glendon P. Groves.

Thomas R. Meeks, Clarksville, Tennessee, for the appellees, Ellen P. Groves and Cheryl Phillips Travis.

## OPINION

## I.

Ellen Phillips Groves is currently eighty-eight years old. She was born in December 1914 and was one of twelve children. In 1936 she married Reilous Clifton Groves ("R. C. Groves"), and the couple settled in Cheatham County. They had no children. According to one of Ms. Groves's

nieces, Ms. Groves was a virtual slave to her husband during their marriage and "had no happy life whatsoever." During the 1990s, as age and frailty pursued them, Ellen and R. C. Groves began to rely more and more on help and support of family members and friends to enable them to remain in their home.

During their lengthy marriage, R. C. Groves and Ellen Groves acquired three tracts of real property in Cheatham County valued at between $60,000 and $65,000. Their home, an old grocery store they operated in the 1940s and 1950s, and R. C. Groves's garage were located on this property. They also accumulated over $118,000 in liquid assets,[1] Mr. Groves's mechanics tools and guns, home furnishings, and a collection of old coins having a face value of $2,817.34.

R. C. Groves broke three ribs when he fell out of bed on March 16, 1994. His brother, Glendon Groves, drove him to the emergency room of a hospital in Dickson where he was treated and released the same day. He was returned to the hospital by ambulance on March 20, 1994, and again on March 29, 1994. While still hospitalized in Dickson, R. C. Groves must have learned that he was facing a lengthy convalescence and that he might never be able to return home. Accordingly, he and his brother devised a plan to preserve R. C. Groves's financial resources from being depleted by medical expenses.

According to Glendon Groves, R. C. Groves decided to give him the $100,000 certificate of deposit in return for his assurance that he would take care of R. C. Groves and Ellen Groves for the rest of their lives. On the evening of April 3, 1994, Glendon Groves asked Donna Smith, one of his brother's neighbors who had been chauffeuring Ms. Groves to and from the hospital, to drive Ms. Groves to the Dickson branch of the People's Bank on their way to the hospital. The following morning, Ms. Smith drove Ms. Groves to the bank where Ms. Groves told a bank employee that she wished to redeem their certificate of deposit. Because the certificate of deposit had not yet expired, the bank employee deducted the penalty for early withdrawal and gave Ms. Groves a cashier's check for $97,873.29 made payable to her. After driving Ms. Groves to the hospital to visit her husband, Ms. Smith drove Ms. Groves to Glendon Groves's flea market, Flea World, and observed her handing the cashier's check to Glendon Groves.

On April 6, 1994, R. C. Groves was moved from the hospital in Dickson to the Palmyra Nursing Home in Montgomery County. On the same day, both he and Ms. Groves executed general powers of attorney granting Glendon Groves authority to act on their behalf with regard to all financial matters. Around this same time, Glendon Groves asked Ms. Smith to drive Ms. Groves to the local office of the Department of Human Services to apply for food stamps, Medicaid, and TennCare. Ms. Groves was approved for these benefits, and R. C. Groves also applied for and became eligible to receive TennCare benefits on May 1, 1994.[2]

---

[1]These assets included a $100,000 certificate of deposit at the People's Bank in Dickson, Tennessee and $18,258 in cash that R. C. Groves kept at his house.

[2]All these government programs have income and asset eligibility requirements. Neither R. C. Groves nor Ms. Groves would have qualified for these benefits as long as they owned the $100,000 certificate of deposit. Accordingly, despite Glendon Groves's protestations to the contrary, it is clear that either R. C. Groves or Glendon Groves or both of them decided to redeem the certificate of deposit and "give" the money to Glendon Groves in order to defraud the
(continued...)

R. C. Groves was somewhat eccentric about his possessions. Before he entered the nursing home, he asked Ms. Smith to bring him the old coins and folding money he kept in his house. She complied, and, after looking through it, R. C. Groves asked Ms. Smith to hide the money, $18,258 in bills and $2,817.34 in old coins, in a space underneath the refrigerator in his house. Ms. Smith complied.

Glendon Groves did not cash Ms. Groves's $97,873.29 cashier's check immediately. He held it until March 8, 1995, when he exchanged it at the Farmers and Merchants Bank in Clarksville for a $97,873.29 cashier's check made payable to him. Even after this transaction, he held the cashier's check without depositing it in the bank because he desired to avoid paying tax. Even though he insisted that R. C. and Ellen Groves had given him the money to "do whatever you want to with it," he stated that he intended to use the money to take care of R. C. and Ellen Groves and that he had "put it [the money] back in case I needed it."

R. C. Groves became seriously ill in late September 1995 and was hospitalized in the intensive care unit. On October 1, 1995, Ms. Smith, concerned that the money under the Groves's refrigerator would disappear, got permission from Ellen Groves to retrieve the money and take it home for safekeeping. R. C. Groves died two days later on October 3, 1995. One week later, Glendon Groves paid Buckner Funeral Home $7,384.21 for his brother's funeral by cashing the $97,873.29 cashier's check, keeping $7,384.21, and obtaining another cashier's check for $90,489.08.

Following R. C. Groves's death, Glendon Groves and his wife, Wilmuth, discovered that the money R. C. Groves had kept in his house was missing and planted the seeds in Ellen Groves's mind that Ms. Smith had stolen it. On October 11, 1995, after Ms. Groves accused her of stealing the money, Ms. Smith carefully inventoried and counted the folding money and coins and returned $21,075.34 to Ms. Groves.[3] According to Glendon Groves, Ms. Groves gave him the money outright on October 11 or 12, 1995. He converted the coins to folding money and held the funds until the trial court ordered him to deposit them in the bank.

Ellen Groves continued to live in her house in Charlotte after her husband died. As time went by she became increasingly less able to care for herself. She came to rely more heavily on Glendon and Wilmuth Groves. Other family members and her friends and neighbors had not lost interest in her, but Glendon and Wilmuth Groves gave them the impression that they were not needed or welcome at Ellen Groves's house. Ms. Groves seemed to have turned against many of her family and neighbors, and so many of them decided to stay away, believing that she had been "brainwashed" by Glendon Groves and his wife. While she continued to live in her home, Ms. Groves, with the assistance of Glendon Groves's lawyer, prepared a new will that left the bulk of her estate to Mr. Groves and his wife.

---

[2](...continued)
State of Tennessee.

[3]Ms. Smith sought the assistance of her husband and Ray Groves, one of R. C. Groves's brothers, in counting the money before she returned it.

In early September 1997, Ms. Groves fell and fractured her spine. She underwent surgery and was hospitalized for approximately two weeks. The injury undermined Ms. Groves's ability to continue living independently in her own house. On September 16, 1997, she moved in with Glendon and Wilmuth Groves who converted one of their children's bedrooms for her use. At this point, Ms. Groves relied completely on Glendon and Wilmuth Groves for her meals, lodging, and care. For their part, Glendon and Wilmuth Groves discouraged visits by family members and friends by telling them when they inquired that Ms. Groves was not up to visiting with anyone.

According to Glendon Groves, Ms. Groves decided to give him her real property after she had been living in his house for approximately three months. Therefore, Glendon Groves asked his lawyer to prepare two quitclaim deeds conveying the three tracts of real property to Glendon and Wilmuth Groves. The lawyer brought the deeds to Glendon Groves's house on December 8, 1997, and Ms. Groves signed them while sitting in a rocking chair in Glendon Groves's living room.

Ms. Groves's stay with Glendon and Wilmuth Groves was short-lived. Their relationship became strained after Ms. Groves chanced upon their daughter kissing her boyfriend at the bottom of the stairs. In addition, Ms. Groves became convinced that Wilmuth Groves was stealing her money and other personal belongings. Accordingly, Glendon and Wilmuth Groves decided to place Ms. Groves in a nursing home. They reported to Dr. David L. Gullett, an internist in Clarksville, that Ms. Groves was getting out of their home and wandering off and that she was hostile and paranoid at times. Dr. Gullett concurred that Ms. Groves should be placed in a nursing home, and so on February 23, 1998, Ms. Groves was moved to the Clarksville Manor Nursing home.[4]

Ms. Groves was upset and angry about being placed in a nursing home. Glendon Groves thought that she was acting "arrogantly" towards him when he visited her, and he began to visit her less frequently. Eventually he stopped visiting her altogether. It was at this point that several members of Ms. Groves's family, chiefly her nieces, Marlene Proctor and Cheryl Travis, began to visit her more regularly. Ms. Proctor's visits ended in April when her son was killed, but Ms. Travis kept up her visits and talked with Ms. Groves's daily by telephone. According to Ms. Travis, Ms. Groves complained bitterly that Glendon and Wilmuth Groves had taken all her money and had put her in the nursing home. In an effort to comfort her aunt, Ms. Travis told Ms. Groves that she was welcome to live with her and her husband.

On March 11, 1998, Glendon Groves filed a petition in the Chancery Court for Montgomery County, alleging that Ms. Groves was incompetent and seeking to be appointed her conservator. As soon as the petition was filed, the court appointed a Clarksville lawyer to serve as Ms. Groves's guardian ad litem. Thereafter, on April 13, 1998, Ms. Proctor and Ms. Travis filed a response opposing Glendon Groves's petition and a cross-petition requesting that they be named Ms. Groves's

---

[4]Glendon Groves wrote a personal check for $2,306 for Ms. Groves's first month in the nursing home. Apparently Ms. Groves's subsequent expenses have, for the most part, been borne by TennCare. The record is ambiguous regarding whether Mr. Groves was ever reimbursed for the cost of the first month of Ms. Groves's stay in the nursing home. In its final order, the trial court approved reimbursing him $1,772 for "the entry fee at the Clarksville Manor Nursing Home."

co-conservators.[5] Ms. Proctor and Ms. Travis alleged that Glendon Groves and Wilmuth Groves had taken advantage of Ms. Groves's deteriorating mental and physical condition by convincing her to convey her real property to them and by unlawfully diverting the $100,000 certificate of deposit from Ms. Groves to their own use. Glendon Groves responded by vigorously denying the allegations contained in Ms. Travis's and Ms. Proctor's response and cross-petition and by filing a counterclaim for defamation, intentional infliction of emotional distress, and abuse of process against Ms. Proctor and Ms. Travis. Glendon Groves asserted that Ms. Groves's nieces had caused him $200,000 in damages.[6]

As time went by, Ms. Travis's relationship with the nursing home staff became strained because she was convinced that Ms. Groves was being over-medicated and was not being properly cared for. For its part, the nursing home staff declined to address many of Ms. Travis's concerns because they viewed Glendon Groves as the responsible party with regard to Ms. Groves's care. The problems culminated on July 3, 1998, with a heated argument between Ms. Travis and the nursing home staff over access to Ms. Groves's medical chart. The nursing home eventually telephoned the police to complain about Ms. Travis.

On July 20, 1998, Glendon Groves used the July 3, 1998 incident as a basis for seeking a restraining order preventing Ms. Travis from visiting Ms. Groves in the nursing home. The trial court filed an order on July 20, 1998, enjoining Ms. Travis from "entering the premises at Clarksville Manor Nursing Home or harassing the staff or patients there in any way." Still, the legal skirmishing between Glendon Groves and Ms. Travis continued. First, Ms. Groves, with the assistance of Ms. Travis's lawyer, filed a motion requesting permission to move out of the nursing home and into Ms. Travis's home pending the trial.[7] Glendon Groves opposed the motion on the ground that it was in Ms. Groves's best interests to remain in the nursing home and provided letters from a psychiatrist and a clinical psychologist stating that it would not be in Ms. Groves's best interests to leave the nursing home. Ms. Groves, again with the assistance of Ms. Travis's lawyer, moved to dissolve the conservatorship because she believed that it was jeopardizing her health and property. Glendon Groves also opposed this motion by providing a letter from a psychiatrist pointing out that Ms. Groves "suffers from moderate to severe dementia, probably of the Alzheimer's type."

The trial court conducted a non-jury trial on December 20 and 27, 1999. At the conclusion of the proof, the trial court invited Ms. Groves's guardian ad litem to address the court. The

---

[5]Ms. Proctor eventually voluntarily dismissed her request to be appointed co-conservator after her son's death, leaving Ms. Travis to proceed on her own. However, Ms. Proctor remained opposed to Mr. Groves being appointed Ms. Groves's conservator.

[6]Glendon Groves voluntarily dismissed his claims against Ms. Proctor after she voluntarily dismissed her claims against him.

[7]The record contains no explanation concerning why Ms. Groves's guardian ad litem did not join in or otherwise respond to this motion. The basis for this motion was Ms. Groves's claim that she was "apprehensive and very frightened and suffers anxiety and stress about people being allowed to walk down the hallways, coming into her room and staring at her at all times of the day and night."

guardian ad litem observed that "basically every bad thing that Mr. Meeks[8] has had to say about Mr. Groves I agree with and every bad thing that Ms. Kersh[9] has had to say about Mrs. Travis I pretty much agree with." After describing Glendon Groves's handling of R. C. and Ellen Groves's money and property as "fast and loose to say the least," Ms. Groves's guardian ad litem also expressed concern about whether Ms. Travis was truthful enough to be trusted with Ms. Groves's real and personal property. Accordingly, the guardian ad litem declined to recommend either Glendon Groves or Ms. Travis to be Ms. Groves's conservator.[10]

The trial court delivered its opinion from the bench immediately following the guardian ad litem's comments. After reciting a narrative of the facts in some detail, the trial court directed Glendon Groves to return the real and personal property formerly owned by Ms. Groves and to make a proper accounting of the money he had received and spent on her behalf.[11] The trial court denied Glendon Groves's claims for payment for the food, cleaning services, and lodgings he and his wife provided to Ms. Groves between May 1994 and February 1998.[12] In addition, the court determined that Ms. Groves was entitled to the proceeds from the rental of her house, as well as all the furniture, tools, and equipment that had been in their house and R. C. Groves's garage.[13] Finally, the court dismissed Glendon Groves's slander claims and contempt petitions against Ms. Travis and dissolved the restraining order preventing her from visiting Ms. Groves in the nursing home. Glendon Groves has appealed from this order.

## II.
### ELLEN GROVES'S CAPACITY TO MANAGE HER PERSONAL AND FINANCIAL AFFAIRS

The issue at the heart of this case is whether Ms. Groves has had the capacity since 1995 to manage her personal and financial affairs. The trial court concluded that Ms. Groves is "competent" because (1) she "retains the ability of long term memory," (2) she is "able to express her will and make decisions," and (3) she is "capable of . . . making decisions as to where she wants to live." With all deference to the trial court, we have determined that the evidence in this record does not

---

[8]Ms. Travis's lawyer.

[9]One of the lawyers representing Glendon Groves.

[10]For some reason, Ms. Groves's guardian ad litem did not mention using the district public guardian pursuant to the Public Guardianship for the Elderly Law. Tenn. Code Ann. §§ 34-7-101, -105 (2001).

[11]In addition to the $97,873.29 from R. C. and Ellen Groves's certificate of deposit and the $21,075.34 in coins and folding money kept in their house, the trial court noted that Glendon Groves must also account for the $2,300 that had been in Ms. Groves's bank account. The court specifically approved the following expenditures Glendon Groves had already made: $7,384.21 for R. C. Groves's funeral, $4,427.21 for advance funeral arrangements for Ms. Groves, $550 for headstones, $2,005.12 to the Palmyra Nursing Home, and $1,772 to the Clarksville Manor Nursing Home.

[12]Glendon Groves claimed that he was entitled to be paid $9,660 for the care he and his wife provided Ms. Groves after she moved in with them. In addition, he demanded $5,660 for food he delivered to R. C. and Ellen Groves between May 1994 and September 1997, and $7,240 for 181 trips to R. C. and Ellen Groves's home between May 1994 and September 1997.

[13]The trial court specifically determined that Glendon Groves was entitled to the three rifles and the pickup truck that R. C. Groves had given to him.

support its conclusion that Ms. Groves is capable of managing her money and property, to make healthcare decisions, to live independently with any degree of safety, or to execute a will.

## A.

Autonomy, an adult person's right to live life consistent with his or her personal values, is one of the bedrock principles of a free society.[14]  Our understanding of liberty is inextricably intertwined with our belief in physical freedom and self-determination, *Cruzan v. Director, Missouri Dep't of Health*, 497 U.S. 261, 287, 110 S. Ct. 2841, 2856 (1990) (O'Connor, J., concurring),[15] and in our belief in the fundamental right to acquire, own, and dispose of property. *Lynch v. Household Fin. Corp.*, 405 U.S. 538, 545-46, 92 S. Ct. 1113, 1118-19 (1972).  Accordingly, adult persons have a right to exercise autonomous self-determination.  They have the right to choose how they live, how they spend their money, and with whom they associate without undue governmental interference.[16]

When viewed as personal power, autonomy takes on added significance to elderly persons, many of whom fear the loss of their independence and their ability to control their own lives.[17]  All

---

[14]Carolyn L. Dessin, *Financial Abuse of the Elderly*, 36 Idaho L. Rev. 203. 217 (2000) ("Dessin"); Rebecca Dresser, *Missing Persons: Legal Perceptions of Incompetent Patients*, 46 Rutgers L. Rev. 609, 611 (1994); Leslie P. Francis, *Decisionmaking at the End of Life: Patients with Alzheimer's or Other Dementias*, 35 Ga. L. Rev. 539, 543 (2001) ("Francis").  Over one century ago, John Stuart Mill observed:
> The only freedom which deserves the name, is that of pursuing our own good in our own way, so long as we do not attempt to deprive others of theirs, or impede their efforts to obtain it.  Each is the proper guardian of his [or her] own health, whether bodily, or mental and spiritual.  Mankind are great gainers by suffering each other to live as seems good to themselves, than by compelling each to live as seems good to the rest.

JOHN STUART MILL, ON LIBERTY 72 (Penguin Classics ed., Penguin Books 1974) (1859).

[15]Justice Cardozo observed, "Every human being of adult years and sound mind has a right to determine what shall be done with his [or her] own body." *Schloendorff v. Society of New York Hosp.*, 105 N.E. 92, 93 (N.Y. 1914).

[16]Norman Fell, *Guardianship and the Elderly: Oversight Not Overlooked*, 25 U. Tol. L. Rev. 189, 195 (1994)("Fell"); Charles P. Sabatino, *Competency: Refining Our Legal Fictions*, in OLDER ADULTS' DECISION-MAKING AND THE LAW 1 (Michael Smyer et al. eds., 1996).

[17]Patricia A. Parmelee, *Protective Services for the Elderly: Do We Deal Competently With Incompetence?*, 2 L. & Pol'y Q. 397, 415 (1980) ("Parmelee"); Sherry L. Willis, *Assessing Everyday Competence in the Cognitively Challenged Elderly*, in OLDER ADULTS' DECISION-MAKING AND THE LAW 87 (Michael Smyer et. al. eds., 1996) ("Willis").
Many elderly persons report that they fear the loss of the independence more than they fear dying or even abuse.  Willis, at 87.  One elderly person for whom a guardian had been appointed observed: "I cannot tell you how much worse my mental condition is since I have been a 'thing' of the court's without rights.  I want to die, I pray to die.  There is no happiness in my life – my life is over.  I would prefer death to living as a guardianship zombie the rest of my life."  Jeffrey Good & Larry King, *"I Am Not A Criminal . . ."*, St. Petersburg Times, Dec. 16, 1986, at 13-A, *reprinted in* Abuses in Guardianship of the Elderly and Infirm: A National Disgrace, a Briefing of the Chairman of the Subcommittee on Health and Long Term Care, Select Committee on Aging, House of Representatives, 100th Congress, 1st Sess. (Sept. 25, 1987), Comm. Pub. No. 100-641, U.S. Gov't Printing Office, Washington, D.C. (1988).  An American Bar Association staff attorney has also observed that "[a] lot of older people are afraid that they'll be put in a nursing home, or they're afraid that they'll have a guardian appointed for them, and they'd rather be abused than have either of those things happen to them."  Abuse of the Elderly on the Rise, National Public Radio, Morning Edition, May 16, 1995,

(continued...)

that many elderly persons have under their control is the prerogative to decide how to live out the rest of their days and how and in what manner they will control their own property. Their ability to exercise this control and to maintain their individual dignity often forms the basis for their self-esteem and their belief in their continuing viability as a person.[18] Thus, the loss of status as an autonomous member of society can intensify any disability that an elderly person may have.[19]

Incapacity is the legal status that occurs when a person's autonomy becomes either partially or totally impaired.[20] A person lacks the ability to be autonomous – to exercise free will – when he or she lacks the ability to absorb information, to understand its implications, to correctly perceive the environment, or to understand the relationship between his or her desires and actions. A person is likewise incapacitated when he or she cannot control his or her actions or behavior.[21] When a person's autonomy becomes impaired, public policy justifies others stepping in to make choices on the person's behalf to promote the person's best interests and to protect the person from harm.[22] However, public policy also favors allowing incapacitated persons to retain as much autonomy as possible and selecting alternatives that restrict incapacitated persons' autonomy as little as possible. Tenn. Code Ann. § 34-1-127 (2001) (requiring that the "least restrictive alternatives" be placed upon a disabled person consistent with adequate protection of the individual's person and property).[23]

Conservatorship proceedings provide a forum for determining whether a person's ability to remain autonomous has become impaired. Even though these proceedings are intended to promote the best interests of the vulnerable elderly, they carry with them the real possibility of displacing the elderly person's ability to make even the most basic decisions for themselves and to live their lives unfettered by the control of others. Persons who are the subject of a conservatorship face a substantial loss of freedom, *In re Conservatorship of Reyes*, 731 P.2d 130, 131 (Ariz. Ct. App. 1986); *Edward v. Lamkins*, 122 Cal. Rptr. 2d 1, 12 (Ct. App. 2002); *In re Boyer*, 636 P.2d 1085,

---

[17](...continued)
transcript available at 1995 WL 2958309 (quoting Lori Steegal, ABA staff attorney).

[18]Fell, 25 U. Tol. L. Rev. at 195-96; Jan E. Rein, *Preserving Dignity and Self-Determination of the Elderly in the Face of Competing Interests and Grim Alternatives: A Proposal for Statutory Refocus and Reform*, 60 Geo. Wash. L. Rev. 1818, 1867 (1992).

[19]ABA COMM'N ON THE MENTALLY DISABLED & ABA COMM'N ON LEGAL PROBLEMS OF THE ELDERLY, GUARDIANSHIP: AN AGENDA FOR REFORM 20 (1989) (Recommendations of the National Guardianship Symposium and Policy of the American Bar Association) ("GUARDIANSHIP: AN AGENDA FOR REFORM").

[20]Francis, 35 Ga. L. Rev. at 542.

[21]Lawrence A. Frolik, *Statutory Definitions of Incapacity: The Need For a Medical Basis*, *in* OLDER ADULTS' DECISION-MAKING AND THE LAW 40 (Michael Smyer et al. eds., 1996).

[22]Fell, 25 U. Tol. L. Rev. at 196; Robert P. Roca, *Determining Decisional Capacity: A Medical Perspective*, 62 Fordham L. Rev. 1177, 1191 (1994) ("Roca").

[23]Sally B. Hurme, *Current Trends in Guardianship Reform*, 7 Md. J. Contemp. L. Issues 143, 170-71 (1995-1996); Jamie L. Leary, Note, *A Review of Two Recently Reformed Guardianship Statutes: Balancing the Need to Protect Individuals Who Cannot Protect Themselves Against the Need to Guard Individual Autonomy*, 5 Va. J. Soc. Pol'y & L. 245, 263-64 (1997); GUARDIANSHIP: AN AGENDA FOR REFORM, Recommendation IV-3, Commentary, at 20.

1090 (Utah 1981), that resembles the loss of freedom following a criminal conviction. *In re Conservatorship of Roulet*, 590 P.2d 1, 3 (Cal. 1979); *In re Guardianship of Hedin*, 528 N.W.2d 567, 573-74 (Iowa 1995).[24]

Because of the importance of autonomy, it is well-settled that the law presumes that adult persons are sane, rather than insane,[25] and capable, rather than incapable, to direct their personal affairs until satisfactory evidence to the contrary is presented.[26] Mental or physical impairment should never be presumed. *Langston v. Allen*, 493 S.E.2d 401, 403 (Ga. 1997); *Carter v. Mississippi Bar*, 654 So. 2d 505, 513 (Miss. 1995); *In re Lula XX*, 637 N.Y.S.2d 234, 236 (App. Div. 1996); *Arnold v. Arnold*, 657 S.W.2d 506, 507 (Tex. App. 1983). The force of these presumptions does not wane as a person ages. *Zawistoski v. Gene B. Glick Co.*, 727 N.E.2d 790, 794 (Ind. Ct. App. 2000).

Tennessee, unlike many states with updated conservatorship statutes, has not statutorily defined the burden of proof in conservatorship cases. As a general rule, the party with the affirmative of an issue has the burden of proof. *Waste Conversion Sys., Inc. v. Greenstone Indus., Inc.*, 33 S.W.3d 779, 783 (Tenn. 2000); *Freeman v. Felts*, 208 Tenn. 201, 210-11, 344 S.W.2d 550, 554 (1961). Thus, in involuntary conservatorship proceedings, the burden of proof is on the person or persons petitioning for the appointment of a conservator. Placing the burden on the petitioning party is entirely consistent with other states' statutory allocation of the burden of proof.

Because of the value our society places on individual autonomy and self-determination, persons seeking the appointment of a conservator must prove by clear and convincing evidence that the person for whom a conservator is sought is a "disabled person." Tenn. Code Ann. § 34-1-126 (2001).[27] This heightened standard of proof eliminates all serious or substantial doubt concerning the correctness of the conclusions to be drawn from the evidence. *Walton v. Young*, 950 S.W.2d 956, 960 (Tenn. 1997); *Ray v. Ray*, 83 S.W.3d 726, 733 (Tenn. Ct. App. 2001). Evidence satisfying this standard will produce in the fact-finder's mind a firm belief or conviction regarding the truth of the

---

[24]Mark D. Andrews, *The Elderly in Guardianship: A Crisis of Constitutional Proportions*, 5 Elder L.J. 75, 93 (1997) ("Andrews"); Bobbe Shapiro Nolan, Note, *Functional Evaluation of the Elderly in Guardianship Proceedings*, 12 Law Med. & Health Care 210, 214 (1984). Tenn. Code Ann. § 34-3-104(8) (2001) states that persons adjudged to be incapacitated may lose their right to vote, their power to dispose of property, their power to execute legal instruments, their power to make purchases, their power to contract, their right to hold a valid driver's license, and their right to consent to medical treatment. *See also*, ROBERT N. BROWN, THE RIGHTS OF OLDER PERSONS 286 (1970) (identifying the personal rights subject to restriction or curtailment in guardianship or conservatorship proceedings).

[25]*State v. Phillips*, 968 S.W.2d 874, 878 (Tenn. Crim. App. 1996); *Roberts v. Roberts*, 827 S.W.2d 788, 794 (Tenn. Ct. App. 1991); *Tennessee Consol. Coal Co. v. Layne*, 26 Tenn. App. 635, 638, 176 S.W.2d 369, 370 (1943).

[26]*In re Phyllis P.*, 695 N.E.2d 851, 852 (Ill. 1998); *Beeman v. Department of Health and Mental Hygiene*, 666 A.2d 1314, 1325 (Md. Ct. Spec. App. 1995); *In re Estate of Bobst*, 630 N.Y.S.2d 228, 231 (N.Y. Sur. Ct. 1995); *Hall v. Hall*, 352 S.W.2d 765, 767 (Tex. Civ. App. 1962); *Hauer v. Union State Bank*, 532 N.W.2d 456, 461 (Wis. Ct. App. 1995); *see also* Mark Fowler, Note, *Appointing An Agent To Make Medical Treatment Choices*, 84 Colum. L. Rev. 985, 988 n.14 (1984).

[27]Many other states employ this heightened standard of proof in guardianship and conservatorship proceedings. *See, e.g.*, *In re Gordy*, 658 A.2d 613, 616-17 (Del. Ch. 1994); *In re Guardianship of Hedin*, 528 N.W.2d 567, 580-81 (Iowa 1995); *In re Conservatorship of Lundgaard*, 453 N.W.2d 58, 61 (Minn. Ct. App. 1990); *In re Turnbough*, 34 S.W.3d 225, 227 (Mo. Ct. App. 2000).

factual propositions sought to be established by the evidence. *Fruge v. Doe*, 952 S.W.2d 408, 412 n.2 (Tenn. 1997); *O'Daniel v. Messier*, 905 S.W.2d 182, 188 (Tenn. Ct. App. 1995).

**B.**

The appointment of conservators in Tennessee no longer hinges on a determination of incompetency.[28] For the past ten years,[29] conservatorship proceedings have focused on the capacity of the person for whom a conservator is sought. Conservators may now be appointed only for persons who are disabled. Tenn. Code Ann. § 34-1-101(7) defines a "disabled person" as

> any person eighteen (18) years of age or older determined by the court to be in need of partial or full supervision, protection and assistance by reason of mental illness, physical illness or injury, developmental disability, or other mental or physical incapacity.

As the law now stands, the threshold question in every conservatorship proceeding is whether the person for whom a conservator is sought is disabled or incapacitated. If the answer is no, the trial court cannot appoint a conservator.[30] If, however, the answer is yes, the court must then determine whether the person is fully or partially incapacitated and whether the incapacity is temporary or permanent. The trial court must also determine, based on the nature of the incapacity, whether the disabled person requires full-time supervision, protection, or assistance or whether partial supervision, protection, or assistance will suffice. If the trial court determines that the disabled person requires any sort of supervision, protection or assistance, it must enter an order appointing a conservator and must specifically "[e]numerate the powers removed from the respondent and vested in the conservator." Tenn. Code Ann. § 34-3-107(2). Any power not specifically vested in the conservator remains with the person for whom the conservator has been appointed.

**C.**

Tennessee's conservatorship statutes do not define the concept of incapacity and do not identify any particular illnesses or conditions deemed to be disabling or incapacitating. The definition of "disabled person" alludes in the most general terms to "mental illness, physical illness, developmental disability or other mental or physical incapacity." Thus, while identification of the

---

[28]Prior to 1993, the creation of a conservatorship or a limited guardianship required a judicial determination of incompetence. Tenn. Code Ann. §§ 34-4-202, -302 (Repealed 1992).

[29]The Tennessee General Assembly revised and updated Tennessee's guardianship and conservatorship statutes in 1992. Act of Apr. 29, 1992, ch. 794, 1992 Tenn. Pub. Acts 407, codified at Tenn. Code Ann. §§ 34-1-101 through -131, 34-2-101 through -106, and 34-3-101 through -109 (2001). The revisions were the product of the efforts of a legislative joint study committee and the Tennessee Bar Association's Probate Study Committee. Donna R. Tate-Hackett, Comment, *Survey of the New Tennessee Guardianship and Conservatorship Act*, 60 Tenn. L. Rev. 651, 651 n.2 (1993); Mary D. Colley & Colleen P. MacLean, *Changes in Tennessee's Guardianship and Conservatorship Statute*, Tenn. B.J., Jan.-Feb. 1993, at 14-15.

[30]In fact, if the trial court determines that a person is not disabled and dismisses the conservatorship petition, it may, upon request, order the record of the proceedings to be expunged. Tenn. Code Ann. § 34-1-124 (2001).

disabling illness, injury, or condition is an important part of a conservatorship proceeding, the pivotal inquiry involves not merely the diagnosis but also the effect that the illness, injury, or condition has had on the capacity of the person for whom a conservator is sought.

Participants in conservatorship proceedings involving elderly persons should avoid the subtle influences of ageism[31] and the double standards that accompany it. The aging process, by itself, is not a disabling condition, and being elderly is not tantamount to being disabled.[32] The popular notion that the aging process entails progressive decline in capacity or competence vastly oversimplifies a complex process that affects an extraordinarily large and diverse group of persons.[33]

Even though the aging process can undermine aspects of a person's physical and mental health, poor health is not as prevalent among the elderly as many assume. Approximately 75% of persons between 65 and 74 years of age and 65% of persons 75 years of age and over report that they are in good health.[34] Ninety-five percent of persons over 65 years of age and 80% of persons over 80 years of age are not affected by significant cognitive impairment.[35] Many elderly persons are able to minimize or overcome the effects of physical and mental decline because of their personal characteristics, through treatment, and by adaption.[36] Thus, a vast majority of the elderly are not experiencing a progressive physical or mental decline.[37]

---

[31]Dr. Robert N. Butler, the first director of the National Institute on Aging coined the term "ageism" in 1968. He defined it as "a process of systematic stereotyping of and discrimination against people because they are old . . .. [J]ust as racism and sexism accomplish this with skin color and gender . . . ageism allows the younger generation to see older people as different from themselves; thus they subtly cease to identify with their elders as human beings." Robert N. Butler, *Dispelling Ageism: The Cross-Cutting Intervention*, 503 Annals Am. Acad. Pol'y & Soc. Sci. 138, 139 n.2 (1989) (quoting paper previously presented); ROBERT N. BUTLER, WHY SURVIVE? BEING OLD IN AMERICA 12 (1975).

[32]Tennessee's courts have consistently recognized this proposition. While extreme old age may "excite the vigilance of the court," *Condry v. Coffey*, 12 Tenn. App. 1, 19 (1930), advanced age, by itself, does not provide grounds for appointing a conservator or limited guardian. *Hadley v. Latimer*, 11 Tenn. (3 Yer.) 537, 545 (1832); *In re Estate of Oakley*, 936 S.W.2d 259, 260 (Tenn. Ct. App. 1996); *Smith v. Smith*, 55 Tenn. App. 136, 160-61, 397 S.W.2d 186, 197 (1965); *Rogers v. Hickam*, 30 Tenn. App. 504, 512-13, 208 S.W.2d 34, 37 (1947). Prior to 1993, Tennessee's statutes governing limited guardianships and conservatorships specifically identified "advanced age" as one of the conditions that could cause a person to become disabled or incompetent. Tenn. Code Ann. §§ 34-4-101(2), -203(a) (Repealed 1992). The statutory references to "advanced age" were removed as part of the 1992 revisions in the conservatorship statutes.

[33]Parmelee, 2 L. & Pol'y Q. at 401; Robert Rubinson, *Constructions of Client Competence and Theories of Practice*, 31 Ariz. St. L.J. 121, 133 (1999) ("Rubinson").

[34]Frank B. Hobbs, Bureau of the Census, U.S. Dep't of Commerce, Pub. No. P23-190, Current Population Reports, Special Studies, *65+ in the United States* 3 (1996), *available at* http://www/census.gov/prod/1/pop/p23-190/p23-190.pdf ("65+ in the United States").

[35]Roca, 62 Fordham L. Rev. at 1181.

[36]Fell, 25 U. Tol. L. Rev. at 192.

[37]Rubinson, 31 Ariz. St. L.J. at 133.

Still, the realities of aging are frequently harsher than the common expectations about the golden retirement years.[38] Despite the advances in healthcare that enable Americans to live longer, the percentage of persons with disabilities increases sharply with age. Persons 65 years of age and over experience the greatest incidence of chronic conditions, as well as the greatest limitations on their usual activities because of these conditions.[39] These physical and non-physical disabilities take a much heavier toll on the oldest old.[40] More than one-half (54.5%) of persons 65 years of age and older report having at least one disability, and more than one-third (37.7%) report having at least one severe disability. In contrast, approximately three out of every four (73.6%) persons 80 years of age and over report at least one disability, and more than one-half (57.6%) report one or more severe disabilities.[41]

As a result of these disabilities, 14.2% of persons 65 years of age and over report having difficulty carrying out activities of daily living "("ADLs");[42] while 21.6% report difficulty with instrumental activities of daily living ("IADLs").[43] A Profile of Older Americans: 2001, at 11. Accordingly, the need of the non-institutionalized elderly for personal assistance with everyday activities increases with age. Approximately one-half of the persons over 85 years of age require personal assistance of some sort.[44] In addition, disabilities require 4.5% of persons 65 years of age or over to be placed in nursing homes. This percentage increases to 18.2% for persons 85 years of age or over.[45] The Tennessee General Assembly recognized this phenomenon when it enacted the

---

[38]Andrews, 5 Elder L.J. at 77-78; Fell, 25 U. Tol. L. Rev. at 191.

[39]Bruce K. Schefft & Beverly K. Lehr, *Psychological Problems in Older Adults*, *in* GERONTOLOGY: PERSPECTIVE AND ISSUES 283, 286-87 (Kenneth F. Ferraro ed., 1990).

[40]Administration on Aging, U.S. Dep't of Health and Human Servs., *A Profile on Older Americans: 2001* 11, *available at* http://www.aoa.gov/aoa/stats/profile/2001/2001profile.pdf ("A Profile of Older Americans: 2001").

[41]A Profile of Older Americans: 2001, at 11; Bureau of the Census, U.S. Dep't of Commerce, *Population of the United States: 2000* (Internet Release), at 19-1 (2002), *at* http://www.census.gov/population/pop-profile/2000/profile2000.pdf ("Population Profile of the United States: 2000").

[42]ADLs include bathing, dressing, eating, toileting, getting around inside the house, and getting in or out of bed or a chair. Population Profile of the United States: 2000, at 19-1.

[43]IADLs involve eight common tasks, including going outside the house, keeping track of money and bills, preparing meals, doing light housework, using the telephone, and taking prescription medicine in the right amount and at the right time. Population Profile of the United States: 2000, at 19-1; William B. Applegate et al., *Instruments for the Functional Assessment of Older Patients*, 322 New Eng. J. Med. 1207, 1209 (1989); David M. Bass & Linda S. Noelker, *Family Caregiving: A Focus on Aging Research and Intervention*, *in* GERONTOLOGY: PERSPECTIVES AND ISSUES 243, 246 (Kenneth F. Ferraro ed., 2d ed. 1997).

[44]65+ in the United States, at 5; Bureau of the Census, U.S. Dep't of Commerce, Pub. No. P23-194, Current Population Reports, Special Studies, *Population Profile of the United States: 1997* 51 (1998), *available at* http://www.census.gov/prod/3/98pubs/p23-194.pdf.

[45]A Profile of Older Americans: 2001, at 4; Lisa Hetzel & Anetta Smith, Bureau of the Census, U.S. Dep't of Commerce, Pub. No. C2KBR/01-10, Census 2000 Brief, *The 65 Years and Over Population: 2000* 7 (2001), *available at* http://www.census.gov/prod/2001pubs/c2kbr01-10.pdf; Bureau of the Census, U.S. Dep't of Commerce, Pub. No.

(continued...)

Public Guardianship for the Elderly Law by acknowledging "that many elderly persons in the state are unable to meet essential requirements for their physical health or to manage essential aspects of their financial resources." Tenn. Code Ann. § 34-7-102(a) (2001).

## D.

Capacity is not an abstract, all-or-nothing proposition.[46] It involves a person's actual ability to engage in a particular activity.[47] Accordingly, the concept of capacity is task-specific.[48] A person may be incapacitated with regard to one task or activity while retaining capacity in other areas because the skills necessary in one situation may differ from those required in another.[49] *Godinez v. Moran*, 509 U.S. 389, 413, 113 S. Ct. 2680, 2694 (1993) (Blackmun, J., dissenting) (observing that "[a] person who is 'competent' to play basketball is not thereby 'competent' to play the violin.").

Capacity is also situational and contextual,[50] and it may even have a motivational component.[51] It may be affected by many variables that constantly change over time.[52] These variables include external factors such as the time of day, place, social setting, and support from relatives, friends, and supportive agencies.[53] It may also be affected by neurologic, psychiatric, or

---

[45](...continued)
SB/95-8, Statistical Brief, *Sixty-Five Plus in the United States* 3 (1995), *available at* http://www.census.gov/apsd/statbrief/sb95_8.pdf.

[46]Andrews, 5 Elder L.J. at 101; Marshall B. Kapp & Douglas Mossman, *Measuring Decisional Capacity: Cautions on the Construction of a "Capacimeter*," 2 Psychol. Pub. Pol'y & L. 73, 87 (1996) ("Kapp & Mossman"); Willis, at 91.

[47]Andrews, 5 Elder L.J. at 100; Stephen J. Anderer, *A Model For Determining Competency in Guardianship Proceedings*, 14 Mental & Physical Disab. L. Rep. 107, 108 (1990) ("Anderer").

[48]Kapp & Mossman, 2 Psychol. Pub. Pol'y & L. at 83; Charles P. Sabatino, *Representing A Client With Diminished Capacity: How Do You Know It and What Do You Do About It?*, 16 J. Am. Acad. Matrim. L. 481, 485 (2000) ("Representing A Client With Diminished Capacity").

[49]Andrews, 5 Elder L.J. at 100-01; Anderer, 14 Mental & Physical Disab. L. Rep. at 108; David L. Shapiro, *Ethical Dilemmas for the Mental Health Professional: Issues Raised By Recent Supreme Court Decisions*, 34 Cal. W.L. Rev. 177, 179 (1997) (being competent for one purpose in no way implies competency for another).

[50]Rubinson, 31 Ariz. St. L.J. at 126.

[51]William M. Altman et al., *Autonomy, Competence, and Informed Consent in Long Term Care: Legal and Psychological Perspectives*, 37 Vill. L. Rev. 1671, 1686 (1992) ("Altman").

[52]Altman, 37 Vill. L. Rev. at 1681; Kapp & Mossman, 2 Psychol. Pub. Pol'y & L. at 83.

[53]Andrews, 5 Elder L.J. at 101; Anderer, 14 Mental & Phys. Disab. L. Rep. at 108; Edwin M. Boyer, *Representing the Client With Marginal Capacity: Challenges for the Elder Law Attorney – A Resource Guide*, 12 Nat'l Acad. Elder Law Attys. Q. 3, at *1 (Spring 1999) ("Boyer"); Gerald K. Goodenough, *The Lack of Objectivity of Physician Evaluations in Geriatric Guardianship Cases*, 14 J. Contemp. L. 53, 55 (1988); Rubinson, 31 Ariz. St. L.J. at 126; Representing a Client With Diminished Mental Capacity at 486.

other medical conditions, such as polypharmacy,[54] many of which are reversible with proper treatment.[55] Finally, capacity is not necessarily static. It is fluid and can fluctuate from moment to moment.[56] A change in surroundings may affect capacity, and a person's capacity may improve with treatment, training, greater exposure to a particular type of situation, or simply the passage of time.[57]

In cases such as this one, capacity encompasses two concepts – functional capacity and decision-making capacity. Functional capacity relates to a person's ability to take care of oneself and one's property. Decision-making capacity relates to one's ability to make and communicate decisions with regard to caring for oneself and one's property. The distinction between cognitive capacity and competence in actual performance is somewhat artificial because functional capacity depends, in part, on decision-making capacity.

Functional capacity to care for oneself involves a person's ability to perform basic daily activities. These activities, commonly referred to as ADLs and IADLs, include personal hygiene, obtaining nourishment, mobility, and addressing routine healthcare needs.[58] An inquiry into functional capacity seeks to ascertain whether a person has functional impairment that endangers physical health or safety by rendering the person unable, either wholly or partially, to care for him or herself. Emphasis should be placed on a person's ability to carry out essential activities in his or her everyday environment, not in the laboratory, doctor's office, or courtroom.[59] The examination should focus on behavior over time, not one or a few specific events whose prejudicial character may lead to a premature conclusion.[60]

Functional capacity to care for property involves a person's ability to manage personal property, real property, and finances. Because a person's ability to manage property depends on the size, type, and complexity of the person's holdings, the first step in the inquiry must be to identify the property that the person owns or controls. The focus of an inquiry into a person's functional capacity to manage property is on whether a person's functional inability to make or communicate

---

[54]Polypharmacy is the medical term for the effect of excessive medication – either too many medications or too much of any one medication. It is a condition frequently encountered in elderly persons. JEFFREY L. CUMMINGS & D. FRANK BENSON, DEMENTIA: A CLINICAL APPROACH 249 (2d ed. 1992).

[55]Warren F. Gorman, *Testamentary Capacity in Alzheimer's Disease*, 4 Elder L.J. 225, 228-29 (1996) ("Gorman").

[56]Anderer, 14 Mental & Phys. Disab. L. Rptr. at 108; Francis, 35 Ga. L. Rev. at 542; Gorman, 4 Elder L.J. at 228; Rubinson, 31 Ariz. St. L.J. at 126.

[57]Andrews, 5 Elder L.J. at 101.

[58]Anderer, 14 Mental & Phys. Disab. L. Rep. at 110; Penelope A. Hommel, *Guardianship Reforms in the 1980s: A Decade of Substance and Procedural Change*, *in* OLDER ADULTS' DECISION-MAKING AND THE LAW 233 (Michael Smyer et al. eds., 1996).

[59]Willis, at 89-90.

[60]John Parry, *Selected Recommendations from the National Guardianship Symposium at Wingspread*, 12 Mental & Phys. Disab. L. Rep. 398, 404 (1988).

decisions regarding the acquisition, administration, or disposition of his or her property may lead to the waste or dissipation of the property.

Decision-making capacity involves a person's ability (1) to take in and understand information, (2) to process the information in accordance with his or her own personal values and goals, (3) to make a decision based on the information, and (4) to communicate the decision.[61] Requiring that decisions be tested against a person's own values and goals reflects the importance of determining a person's capacity in light of his or her own habitual standards of behavior and values, rather than the standards and values of others.[62] A person does not lack decision-making capacity merely because he or she does things that others either do not understand or find disagreeable. Foolish, unconventional, eccentric, or unusual choices do not, by themselves, signal incapacity.[63] However, choices that are based on deranged or delusional reasoning or irrational beliefs may signal decision-making incapacity.[64]

An evaluation of decision-making capacity focuses chiefly on the process a person uses to make a decision and only secondarily on the decision itself. It analyzes a person's ability to understand pertinent information and to reason and deliberate about choices particular to a specific decision.[65] Twenty-five years ago, we characterized this capacity as the "mental ability to make a rational decision." *State Dep't of Human Servs. v. Northern*, 563 S.W.2d 197, 209 (Tenn. Ct. App. 1978). We used the adjective "rational" to connote a decision based on a process of reasoning, not

---

[61]Anderer, 14 Mental & Phys. Disab. L. Rep. at 111; Jessica W. Berg et al., *Constructing Competence: Formulating Standards of Legal Competence to Make Medical Decisions*, 48 Rutgers L. Rev. 345, 351 (1996), citing, Paul S. Applebaum & Thomas Grisso, *Assessing Patients' Capacity to Consent to Treatment*, 319 New Eng. J. Med. 1635, 1635-36 (1988) ("Constructing Competence") (identifying the four components of capacity as the ability to communicate a choice, the ability to understand relevant information, the ability to appreciate the nature of the situation and its likely consequences, and the ability to manipulate information rationally); Uniform Probate Code § 5-102(4) (amended 1998), 8 U.L.A. 61 (Supp. 2002) (defining an "incapacitated person" as "an individual who . . . is unable to receive and evaluate information or make or communicate decisions . . . ."); 1 President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Making Health Care Decisions: The Ethical and Legal Implications of Informed Consent in the Patient-Practitioner Relationship* 57 (1982) (stating that "[d]ecisionmaking capacity requires, to a greater or lesser degree: (1) possession of a set of values and goals; (2) the ability to communicate and understand information; and (3) the ability to reason and to deliberate about one's choices.") THE HASTINGS CENTER, GUIDELINES ON THE TERMINATION OF LIFE-SUSTAINING TREATMENT AND THE CASE OF THE DYING 131 (Indiana Univ. Press 1987).

[62]MICHAEL SILBERFELD & ARTHUR FISH, WHEN A MIND FAILS: A GUIDE TO DEALING WITH INCOMPETENCY 47-48 (1994); Representing a Client With Diminished Mental Capacity, 16 J. Am. Acad. Matrim. L. at 485.

[63]*In re Fisher*, 552 N.Y.S.2d 807, 815 (N.Y. Sup. Ct. 1989); *In re Appointment of Guardians for Baker*, No. 14348, 1992 W.L. 884975, at *1 (Va. Cir. Ct. Oct. 20, 1992); 3 FOWLER V. HARPER ET AL., THE LAW OF TORTS § 17.1, at 562 (2d ed. 1986); Gorman, 4 Elder L.J. at 225; Roca, 62 Fordham L. Rev. at 1195.

[64]Byron Chell, *Competency: What It Is, What It Isn't, and Why It Matters*, in HEALTH CARE ETHICS: CRITICAL ISSUES FOR THE 21ST CENTURY 117-21. (John F. Monagle & David C. Thomama eds., 1998) (Comparing the choices of two hypothetical patients who chose not to have a gangrenous leg amputated and differentiating between religious beliefs and religious delusions).

[65]Constructing Competence, 48 Rutgers L. Rev. at 353-54; D. William Malloy et al., *Measuring Capacity to Complete an Advance Directive*, 44 J. Am. Geriatric Soc'y 660, 662 (1996).

necessarily a decision that the prevailing majority would view as acceptable, sensible, or reasonable.[66]

Persons frequently display different levels of decision-making ability.[67] A person may be simultaneously capable and incapable with respect to different types of decisions.[68] Courts routinely apply different standards for determining capacity depending on the nature of the decision or action involved.[69] Accordingly, capacity should be determined on a decision-specific basis.[70]

## E.

Dementia is a common condition that particularly affects elderly persons. Even though it is not a normal part of the aging process, the risk of developing dementia increases with age.[71] Surveys have established that approximately 10% of persons 65 years old or over have mild dementia and that 5% are severely demented. In comparison, nearly one-half of persons 85 years old or over have some form of dementia, and in 15 to 25% of these persons, the dementia is severe.[72] Because of its

---

[66]*See also* Constructing Competence, 48 Rutgers L. Rev. at 358 n.49 (defining a rational decision as one that flows logically from whatever reasons are offered); Francis, 35 Ga. L. Rev. at 543 (referring to "the ability to link chosen alternatives to . . . values in a reasoned way").

[67]Kapp & Mossman, 2 Psychol. Pub. Pol'y & L. at 87.

[68]Anderer, 14 Mental & Phys. Disab. L. Rptr. at 111-13; David Checkland & Michael Silberfeld, *Reflections on Segregating and Assessing Areas of Competence*, 16 Theoretical Medicine 375, 376 (1995).

[69]*State v. Blackstock*, 19 S.W.3d 200, 205 (Tenn. 2000) (capacity to stand trial); *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002) (capacity to make a will); *Cole v. Cole*, 37 Tenn. (5 Sneed) 57, 59-60 (1857) (capacity to marry); *Rawlings v. John Hancock Mut. Life Ins. Co.*, 78 S.W.3d 291, 297 (Tenn. Ct. App. 2001) (capacity to execute a durable power of attorney); *State v. Jackson*, 52 S.W.3d 661, 667 (Tenn. Crim. App. 2001) (capacity to be a witness); *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000) (capacity to execute a deed).

[70]Kapp & Mossman, 2 Psychol. Pub. Pol'y & L. at 83; Mark Novak & Sean M. Novak, *Clear Today, Uncertain Tomorrow: Competency and Legal Guardianship, and the Role of the Lawyer in Serving the Needs of Cognitively Impaired Clients*, 74 N. D. L. Rev. 295, 302 (1998) ("Novak & Novak"); Timothy A. Salthouse, *Commentary: A Cognitive Psychologist's Perspective on the Assessment of Cognitive Competency*, in OLDER ADULTS' DECISION-MAKING AND THE LAW 37 (Michael Smyer et al. eds., 1996) ("Salthouse") (stating that situational-specific evaluations of actual decision-making are much more appropriate than global assessments of overall mental status).

[71]Nat'l Inst. on Aging & Nat'l Insts. of Health, Pub. No. 00-4859, *Progress Report on Alzheimer's Disease: Taking the Next Steps* 2, 10, *available at* http://www.alzheimers.org/pubs/pr2000.pdf ("Progress Report on Alzheimer's Disease: 2000"); Katalin G. Losonczy et al., *Prevalence and Correlates For Dementia: Survey of the Last Days of Life*, 113 Pub. Health Rep. 273 (U.S. Dep't of Health & Human Servs. 1998) ("Losonczy").

[72]Marshall B. Kapp, *Legal Standards for the Medical Diagnosis and Treatment of Dementia*, 23 J. Legal Med. 359, 366 (2002); Roca, 62 Fordham L. Rev. at 1181; Robert D. Terry & Robert Katzman, *Alzheimer's Disease and Cognitive Loss*, in PRINCIPLES OF GERIATRIC NEUROLOGY 207, 208 (Robert Katzman & John W. Rose eds., 1992); U.S. Congress, Office of Technology Assessment, Pub. No. OTA-BA-323, *Losing A Million Minds: Confronting the Tragedy of Alzheimer's Disease and Other Dementias* 7 (April 1987), *available at* http://www.wws.princeton.edu/cgi-bin/byteserv.prl/~ota/disk2/1987/8715/871503.PDF ("Losing A Million Minds"); Progress Report on Alzheimer's Disease: 2000, at 3.

prevalence, its effects on persons, and the expense of its treatment, dementia is now considered to be an urgent public health priority.[73]

Dementia is a syndrome,[74] rather than an illness, that may accompany over seventy diseases or physical conditions.[75] According to current diagnostic criteria, the essential feature of dementia is the development of multiple cognitive deficits that are severe enough to cause impairment in occupational and social functioning.[76] These deficits include memory impairment,[77] which is a prominent early symptom, and at least one of the following: (1) deterioration of language function (aphasia), (2) impaired ability to execute motor activities despite intact motor abilities, sensory function, and comprehension of the required task (apraxia), (3) inability to recognize objects despite intact sensory function (agnosia), or (4) disturbances in executive functioning.[78] The specific cognitive functions that are lost or impaired and those that remain vary from time to time and from person to person.[79] Dementia does not, however, cause a change in a person's normal level of consciousness.[80]

Dementia has historically been viewed as progressive and irreversible. The current view, however, is that dementia may be progressive, static, or remitting.[81] Its classification and prognosis depends on its cause. Because most dementing conditions are irreversible, most persons with dementia do not recover their lost cognitive abilities. There are important exceptions. Persons with

---

[73]DAVID SHENK, THE FORGETTING – ALZHEIMER'S: PORTRAIT OF AN EPIDEMIC 163 (2001); Losing A Million Minds, at 3; Agency for Healthcare Research and Quality, Medical Expenditure Panel Survey, Pub. No. MEPS HC-037, *1999 Medical Conditions*, Appendix 4 (2002), *available at* http://www.meps.ahrq.gov/pubdoc/hc037/h37doc.htm.

[74]A clinical syndrome is a group or cluster of symptoms, signs, or impairments that tend to occur together and have a distinct natural history. Roca, 62 Fordham L. Rev. at 1177.

[75]Boyer, 12 Nat'l Acad. Elder L. Attys. at *3; Peter J. Rabins, *Dementia and Alzheimer's Disease: An Overview*, 35 Ga. L. Rev. 451, 452 (2001) ("Rabins"); Losing A Million Minds, at 9.

[76]MERCK RESEARCH LABS., MERCK MANUAL OF GERIATRICS 357 (Mark H. Beers & Robert Berklow eds., 3d ed., 2000); Kapp, 23 J. Legal Med. at 365.

[77]The memory impairment may affect short-term and long-term memory. Persons with dementia become impaired in their ability to learn new material, or they forget previously learned material. Most persons with dementia have both forms of memory impairment.

[78]Executive functioning involves the ability to think abstractly and to plan, initiate, sequence, monitor, and stop complex behavior. It involves a person's ability to develop and carry out plans, to form analogies, to obey social rules, to solve problems, to adapt to unexpected circumstances, to do several tasks simultaneously, and to place episodes in time and place. AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 135 (4th ed. text rev. 2000) ("DSM-IV-TR"); Jordan Grafman & Irene Litvan, *Importance of Deficits in Executive Functions*, 354 Lancet 1921, 1921 (1999).

[79]Losing A Million Minds, at 61-62

[80]Rabins, 35 Ga. L. Rev. at 452.

[81]DSM-IV-TR at 157.

dementia brought on by depression, drug toxicity, polypharmacy, or treatable medical conditions may recover completely.[82]

In slowly progressive dementias, incapacity develops gradually and unpredictably.[83]  The progress of impairment depends not only on the specific types of impairment but also on the specific decisions or tasks the person is facing.[84]  Persons with chronic dementing illnesses gradually lose the ability to perform the tasks normal daily living requires.[85]

Alzheimer's Disease is the single most common cause of dementia, accounting for between 60 and 70% of the cases.[86]  Current estimates are that 10% of persons 65 years old and older and over one-half of persons over 85 years old have Alzheimer's Disease or some other form of dementia[87] and that the prevalence of the disease doubles every five years beyond the age of 65.  Approximately 360,000 new cases of Alzheimer's Disease occur each year, and this number will increase as the population ages.[88]

Alzheimer's Disease is a chronic, slowly progressive disorder that is irreversible.[89]  It varies widely in its course and in the rate of its progression.[90]  While the cause of Alzheimer's Disease remains unknown,[91] it is defined by impaired cognitive capacities that cause significant impairment in social or occupational functioning and that represent a significant decline from a person's normal

---

[82]Roca, 62 Fordham L. Rev. at 1181.

[83]Rabins, 35 Ga. L. Rev. at 458.  Dementia's progression has been compared to the tide going out.  One commentator notes that "[t]here may be significant ebb and flow with a person having 'good' and 'bad' days." Dessin, 36 Idaho L. Rev. at 218.

[84]Francis, 35 Ga. L. Rev. at 546 (observing that impairments are not predicably uniform among patients).

[85]Losing A Million Minds, at 70.

[86]Gorman, 4 Elder L.J. at 226; Kapp, 23 J. Legal Med. at 366; Roca, 62 Fordham L. Rev. at 1181; Losing A Million Minds, at 62.

[87]DSM-IV-TR, at 141; James L. McGaugh, *Enhancing Cognitive Performance*, 65 S. Cal. L. Rev. 383, 393 (1991); Novak & Novak, 74 N. D. L. Rev. at 295-96; Mark A. Rothstein, *Predictive Genetic Testing for Alzheimer's Disease in Long-Term Care Insurance*, 35 Ga. L. Rev. 707, 710-11 (2001).

[88]Progress Report on Alzheimer's Disease: 2000, at 2-3.

[89]DSM-IV-TR, at 139, 142; Losing A Million Minds, at 62.

[90]Rabins, 35 Ga. L. Rev. at 454.

[91]Rabins, 35 Ga. L. Rev. at 454; Roca, 62 Fordham L. Rev. at 1181; Paul S. Appelbaum, *Decisionally Impaired Research Subjects*, *in* Research Involving Persons with Mental Disorders That May Affect Decisionmaking Capacity, Vol. II, at 1 (Nat'l Bioethics Advisory Comm'n 1999), *available at* http://govinfo.library.unt.edu/nbac/capacity/volumeii.pdf.

level of functioning.[92] The current diagnostic criteria for Alzheimer's Disease, like that for dementia, requires memory impairment and one or more of the following cognitive disturbances: (1) language disturbance (aphasia), (2) impaired ability to carry out motor activities despite intact motor function (apraxia), (3) inability to recognize or identify objects despite intact sensory function (agnosia), and (4) disturbance in executive functioning. However, a diagnosis of Alzheimer's Disease requires ruling out (1) cognitive deficits caused by other central nervous system conditions known to cause deficits in memory and cognition, (2) deficits caused by systemic conditions that are known to cause dementia, (3) substance-induced conditions, (4) cognitive deficits occurring during the course of a delirium, and (5) deficits that are better accounted for by another Axis I disorder (e.g., major depressive disorder or schizophrenia).[93]

The course of the illness can be broken into stages. During the first stage, memory impairment is the most prominent symptom. During the second stage, the symptoms that may emerge include impairments in language, performing everyday learned activities, recognizing the familiar, and perceiving the world as it is. In addition, impairments in executive functions with regard to personal hygiene, dressing, social etiquette, and self-control in the presence of strong feelings such as anger, frustration, or fear become prominent. During the third stage, the physical impairments associated with Alzheimer's disease become apparent. Many persons become incontinent or mute and lose the ability to walk unaided.[94]

In addition to the cognitive deficits associated with Alzheimer's Disease, many persons with the illness manifest non-cognitive symptoms. These symptoms include angry outbursts, depression, violence, inappropriate sexual behavior, hallucinations, apathy, stubbornness, resistence to care, suspicion and accusation, incessant repeating of the same question, physical self-abuse, reclusiveness, and the use of obscene or abusive language.[95] A majority of these behaviors are common to residents of nursing homes who have been diagnosed with dementia.[96]

In the early stages of Alzheimer's Disease, persons may be capable of living independently and of tending to their individual needs. However, persons become manifestly incapacitated in the later stages of the disease. The impairments that develop during the second stage can interfere with the ability to comprehend options, to remember facts, to make judgments, and to communicate choices. Most persons in the third stage lack the capacity to make decisions of any import.[97]

---

[92]DSM-IV-TR, at 142; Rabins, 35 Ga. L. Rev. at 456.

[93]DSM-IV-TR, at 142-43.

[94]Bruce Jennings, *Freedom Fading: On Dementia, Best Interests, and Public Safety*, 35 Ga. L. Rev. 593, 595 (2001); Rabins, 35 Ga. L. Rev. at 455-56; Losing A Million Minds, at 62-67; Progress Report on Alzheimer's Disease:2000, at 6.

[95]Rabins, 35 Ga. L. Rev. at 456-58; Losing A Million Minds, at 72-77.

[96]Cynthia Steele et al., *Psychiatric Symptoms and Nursing Home Placement of Patients with Alzheimer's Disease*, 147 Am. J. Psychiatry 1049, 1049 (1990).

[97]Gorman, 4 Elder L.J. at 234-35; Rabins, 35 Ga. L. Rev. at 455-56, 458.

The ability of qualified clinicians to diagnose the different types of dementia has improved markedly during the past two decades. This improvement can be traced to (1) the publication of reliable standardized diagnostic criteria,[98] (2) the development of diagnostically useful laboratory tests, (3) the refinement of mental status tests,[99] and (4) the ability to identify specific genotypes to confirm a clinical impression.[100] The current best practice guidelines for diagnosing dementia envision that the examination will include (1) taking a patient's history,[101] (2) conducting a physical examination, and (3) assessing the extent of the patient's functional, as well as cognitive, impairment.[102] A diagnosis of Alzheimer's Disease requires that the manifestations of dementia be apparent for at lease six months.[103] Clinicians can now diagnose Alzheimer's Disease with 80% accuracy based on a medical history and physical examination. Diagnostic accuracy above 90% can be achieved when the medical history and physical examination are augmented with psychological evaluations, laboratory tests, and radiologic examinations.[104]

## F.

By the time of trial, six clinicians had examined Ms. Groves to assess her mental status. These clinicians include her personal physician and two other physicians, one psychiatrist, and two clinical psychologists. Collectively, their examinations of Ms. Groves spanned a period beginning in February 1998 and ending in December 1999. Considered together, these clinicians' reports paint a picture of an elderly woman whose functional capacity is significantly compromised and whose decision-making capacity is significantly impaired and progressively deteriorating.

---

[98]In addition to the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders, the National Institute of Neurological and Communicative Disorders and Stroke, the National Institute on Aging, and the Alzheimer's Disease and Related Diseases Association have published general criteria for diagnosing dementing conditions. Losing A Million Minds, at 39.

[99]The Mini-Mental State Examination ("MMSE") is currently the instrument most commonly used to assess cognitive competency in adults. Roca, 62 Fordham L. Rev. at 1182; Salthouse, at 36; Alistair Burns & Michael Zaudig, *Mild Cognitive Impairment in Older People*, 360 Lancet 1963 (2002); Tom N. Tombaugh & Nancy J. McIntyre, *The Mini-Mental State Examination: A Comprehensive Review*, 40 J. Am. Geriatrics Soc'y 922, 922 (1992) ("Tombaugh"); *see also* http://www.minimental.com; Marshall F. Folstein et al., *Mini-Mental State: A Practical Method for Grading the Cognitive State of Patients for the Clinician*, 12 J. Psychiatric Res. 189 (1993). Other instruments to assess cognitive capacity are also available. Boyer, 12 Nat'l Acad. Elder Law Atty's Q. at *6-7; Kapp, 23 J. Legal Med. at 370, n.73; Kapp & Mossman, 2 Psychol. Pub. Pol'y & L. at 80-81; Representing Clients With Diminished Capacity, 16 J. Am. Acad. Matrim. L. at 494.

[100]Kapp, 23 J. Legal Med. at 369-70; Progress Report on Alzheimer's Disease: 2000, at 5, 29, 31.

[101]The patient history should include information regarding the onset of the manifestation of the symptoms of dementia, the rate of decline in cognitive functioning, and the specific kinds of impairments that the person has developed. Roca, 62 Fordham L. Rev. at 1178.

[102]Kapp, 23 J. Legal Med. at 370, 372; Roca, 62 Fordham L. Rev. at 1181-82; Progress Report on Alzheimer's Disease: 2000, at 11-12.

[103]Losonczy, 113 Pub. Health Rep. at 273.

[104]Losing A Million Minds, at 14.

In February 1998, Mr. Groves and his wife decided to move Ellen Groves into a nursing home because they believed they were no longer able to care for her in their home. They consulted Dr. David Gullett, a Clarksville internist who provided medical care for the residents of the Cumberland Manor Nursing Home without a physician of their own. Based on the information provided by Mr. Groves and his wife, and after taking a history and examining Ms. Groves, Dr. Gullett diagnosed her as demented with paranoid features and concurred that she should be placed in a nursing home.

Shortly after examining Ms. Groves, Dr. Gullett prepared a physician's report to accompany Mr. Groves's conservatorship petition. He rated Ms. Groves's mental condition, adaptive behavior, and social skills as "poor" and recommended that Ms. Groves should be placed under "full and complete guardianship" for her physical well-being, financial affairs, and medical care decisions. In an accompanying progress note, Dr. Gullett observed that Ms. Groves was "mentally unable to handle her affairs."[105]

In addition to Dr. Gullett's report, Mr. Groves obtained a medical report from Dr. Robert W. Hudson, a physician practicing in Adams. Following a personal physical and mental examination of Ms. Groves, Dr. Hudson diagnosed her with dementia of the Alzheimer's type and assessed her mental condition as "poor." He also concluded that Ms. Groves's physical condition and mental status warranted the appointment of a limited guardian for her physical well-being, financial affairs, and medical treatment decisions.

Dr. Tony Franklin, a clinical psychologist in Clarksville who provided psychological services to residents of the Clarksville Manor Nursing Home, began treating Ms. Groves in March 1998 at the request of the nursing director of the nursing home.[106] After performing a mental status examination, Dr. Franklin determined that Ms. Groves had dementia of the Alzheimer's type with paranoid features. He classified Ms. Groves's dementia as "severe" and concluded that she was incapable of living by herself or of making "any rational decisions regarding anything in the span of her control," including her personal and financial affairs.

Dr. Daniel Drinnen, a family practitioner in Dickson, began treating Ms. Groves in 1996. He was asked to assess her mental state in April 1999. Following an examination that included an

[105]The trial court discounted Dr. Gullett's diagnosis because it was "not factually based." Apparently, the trial court's conclusion rests on its belief that Dr. Gullett's opinion was based solely on information provided by Mr. Groves and his wife. However, Dr. Gullett stated in his deposition that he personally examined Ms. Groves in February 1998 and that he continued to provide her with medical care while she remained in the nursing home. According to Dr. Gullett, he saw Ms. Groves at least every other month. Accordingly, it is plain that Dr. Gullett's opinion rests on his personal knowledge of Ms. Groves, not just the information provided by Mr. Groves and his wife. This is not a circumstance that requires us to defer to the trial court's determination of Dr. Gullett's credibility. His testimony is in deposition form. We are equally capable of reading depositions and drawing conclusions therefrom.

[106]The trial court characterized Dr. Franklin as a "company doctor" and discounted his testimony because he was employed by the company that owned the Clarksville Manor Nursing Home. The trial court's conclusion about the relationship between Dr. Franklin's employer and the nursing home is incorrect. Dr. Franklin is employed by Foundation Life Care Services which is a part of Superior Life Care Services. Superior Life Care Services contracts with nursing homes to provide psychological services to their residents. It does not own any nursing homes itself. Thus, the record does not support the conclusion that Dr. Franklin is an employee of the owner of the Clarksville Manor Nursing Home

MMSE, Dr. Drinnen concluded that Ms. Groves was not "insane" but that she had "moderate dementia" based, in part, on her MMSE score of 12.[107]  He also concluded that Ms. Groves was "unable to manage her own affairs regarding finances and this type of thing."  However, noting that Ms. Groves did not want to stay in the nursing home, he also concluded that she was "competent to decide where she wants to stay."  Several months later, he determined that Ms. Groves was "of sound enough mind that she can prepare her own will and understand what is in her will."

In July 1999, Dr. Robert Berberich, a clinical psychologist in Clarksville, performed a mental status examination on Ms. Groves at Ms. Travis's request.  Based on three interviews with Ms. Groves, Dr. Berberich found that Ms. Groves has "at least mild to moderate cognitive impairment" and that she "may not understand the complete extent of her current condition."  Dr. Berberich concluded that Ms. Groves remained able to express her preferences and to state whether she liked or disliked things but cautioned that "it would not be all together feasible to look to Ms. Groves' word as being the sum and all of any decision that needs to be made with respect to how her life or affairs are going to be managed from here on out . . .."  He also found that independent living was no longer an alternative and that Ms. Groves lacked the capacity to make judgments "with respect to complex decisions."

Dr. Kimberly Stalford, a psychiatrist practicing in Clarksville, also evaluated Ms. Groves in July 1999.  Her examination included administering an MMSE on which Ms. Groves scored 15.  Dr. Stalford determined that Ms. Groves had severe dementia[108] and her tentative diagnosis was dementia of the Alzheimer's variety with psychotic features.[109]  In addition to concluding that Ms. Groves lacked the capacity to make decisions about her own well-being, financial affairs, and

---

[107]The MMSE is currently the most widely used screening test to identify minimum levels of cognitive functioning.  It is quite useful for examining persons with dementia, especially when it is adjusted to compensate for age and educational level.  Ronald C. Petersen et al., *Practice Parameter: Early Detection of Dementia: Mild Cognitive Impairment (An Evidence Based Review)*, 56 Neurology 1133 (2001); Rosa M. Crum et al., *Population-Based Norms for the Mini-Mental State Examination by Age and Educational Level*, 269 J. Am. Med. Ass'n 2386 (1993).  The norm MMSE score for persons between 80 and 84 years of age with a fourth grade education is 20; while the norm for persons of the same age who completed high school is 25.

Persons whose MMSE score is 24 or above are rarely found to have inadequate cognitive function for decision-making purposes.  Roca, 62 Fordham L. Rev. at 1182.  However, scores of 23 or less are generally accepted as indicating the presence of cognitive impairment.  Tombaugh, 40 J. Am. Geriatrics Soc'y at 922.  While the MMSE should not serve as the sole criteria for diagnosing dementia, the current trend is to classify the severity of cognitive impairment based on MMSE scores into three levels:  Scores of 24 to 30 indicate no cognitive impairment; scores of 18-23 indicate mild cognitive impairment; and scores of 0-17 indicate severe cognitive impairment.  Tombaugh, 40 J. Am. Geriatrics Soc'y at 922.  Persons with an MMSE score below 24 may be incapable of making rational decisions; however, persons with MMSE scores below 18 are probably incapable of making informed and rational decisions or even to take care of themselves.  Salthouse, OLDER ADULTS DECISION-MAKING AND THE LAW, at 36.

[108]Dr. Stalford explained that severe cognitive impairment accompanied MMSE scores below 20.

[109]The only thing tentative about Dr. Stalford's diagnosis was her conclusion that Ms. Groves's dementia was caused by Alzheimer's Disease.  She reserved making a definitive diagnosis pending an organic workup to rule out the possible reversible causes of Ms. Groves's dementia.  She also concluded that Ms. Groves's mental state was not affected by the medications she was taking.

medical treatment, Dr. Stalford contacted Dr. Gullett to strongly recommend that he prescribe Zyprexa, an anti-psychotic used to treat paranoia and hostility.[110]

Five of the six clinicians who had evaluated Ms. Groves testified in this case. Only Dr. Hudson did not provide testimony explaining his March 1998 certification regarding Ms. Groves's mental status. While Dr. Berberich is the only clinician who actually testified, the trial court received and considered the depositions of Drs. Drinnen, Franklin, Gullett, and Stalford that had been taken between mid-October and mid-December 1999.

The conclusions of these clinicians in late 1999 are remarkably consistent. Dr. Gullett, who continued to treat Ms. Groves in the nursing home, believed that she was incapable of handling her day-to-day affairs and that she needed a conservator. Dr. Franklin, who likewise continued to treat Ms. Groves in the nursing home, believed that she had never been "competent" and that "[h]er ability to care for herself and perform simple acts of daily living has been grossly impaired for some time now and the prognosis for her ever being able to make rational decisions again is negligible. This elderly lady and her condition has continued to decline to the point that she is and will continue to be unable to care for herself." Dr. Drinnen, who last saw Ms. Groves in September 1999, found that she had "deteriorated . . . both physically and mentally."[111] He observed that "[a]t this time, I do not feel that she is able to manage her own affairs and is unable to make a decision regarding where she would stay, and I also do not feel she is competent to understand what her will would say." Dr. Stalford likewise found that Ms. Groves was "incompetent to make any financial decisions on her own due to her diagnosis of Dementia with Psychotic Features. She is unable to recall the date, can not remember conversations, and can not utilize her short-term memory to make any decisions on her behalf." Even Dr. Berberich, who visited Ms. Groves the day before the trial, testified that Ms. Groves had deteriorated since July 1999. He agreed that Ms. Groves had dementia and that "[s]he knew that she couldn't handle her life." While Dr. Berberich believed that Ms. Groves remained able to express her preferences, he determined that she was unable to make complex decisions.

The medical and psychological testimony, coupled with the lay testimony, paints a clear and compelling picture. Ellen Groves's functional and decision-making capacities are significantly impaired and probably have been since her fall in September 1997. The medical and psychological testimony indicates that her mental state is on a deteriorating course with no reasonable prospect for improvement.[112] For the purpose of Tenn. Code Ann. § 34-1-101(7), the record contains clear and

---

[110]The trial court discounted Dr. Stalford's testimony because it believed that her examination had been undermined by the nursing home's failure to inform her that Ms. Groves was taking Biaxin, an antibiotic, for the lesions on her leg. However, the record contains no indication that Biaxin was not on the list of medications provided to Dr. Stalford. There is likewise no evidence that Biaxin causes dementia or that taking it skews the results of an MMSE.

[111]Dr. Drinnen refrained from administering another MMSE to Ms. Groves during his September 1999 visit because she was unable to answer questions meaningfully.

[112]Following the trial, the trial court permitted Ms. Travis to remove Ms. Groves from the nursing home and to bring her to Ms. Travis's home. After seeing Ms. Groves after she left the nursing home, Dr. Berberich prepared a brief letter stating that Ms. Groves "appears on a psychological basis to be vastly improved" based on her "affect," mood, and extent of her confusion. However, Dr. Berberich did not address the nature or extent of the impairment to Ms. Groves's functional and decision-making capacities.

-23-

convincing evidence that Ms. Groves is a disabled person who is in need of a conservator's supervision, protection, and assistance. Thus, the trial court erred by declining to appoint a conservator for Ms. Groves.

Accordingly, the portion of the February 29, 2000 order denying the competing petitions to appoint a conservator for Ms. Groves is vacated, and the case is remanded for further proceedings consistent with this opinion and Tenn. Code Ann. §§ 34-1-301 et seq. and 34-7-101 et seq. The court, in its discretion, may hear whatever additional evidence it deems appropriate regarding (1) the nature and extent of Ms. Groves's current functional and decision-making capacity, (2) the type of supervision, protection, or assistance Ms. Groves requires, and (3) the qualifications and abilities of the person or persons seeking to be appointed Ms. Groves's conservator to provide the supportive services she requires.[113] Thereafter, the trial court shall enter a judgment consistent with Tenn. Code Ann. § 34-3-107 naming a conservator or conservators for Ms. Groves and defining their duties.

## III.
### THE PURPORTED GIFTS OF REAL AND PERSONAL PROPERTY

Mr. Groves and his wife take issue with the portions of the trial court's order divesting them of the real property, cash, and other items of personal property once owned by Ms. Groves and her late husband. First, they assert that the trial court should not have adjudicated the status of this property after it determined that Ms. Groves was "competent." Second, they assert that the evidence supports their claims that the real property, cash, and other items of personal property were valid inter vivos gifts from Ms. Groves and her late husband. We have concluded that Mr. Groves and his wife cannot now take issue with the trial court's decision to address the property issues because they failed to object at trial. We have also concluded that the record contains sufficient evidence to support an order divesting Mr. Groves and his wife of the real property, cash, and other personal property once owned by Ms. Groves and her late husband.[114]

---

[113]The current record already provides a sufficient factual basis for declining to appoint Glendon Groves or Wilmuth Groves as Ms. Groves's conservator. It also raises substantial questions regarding Ms. Travis's suitability. Should Ms. Travis desire to be appointed Ms. Groves's conservator, she will have the burden of demonstrating to the trial court (1) that her home has satisfactory accommodations for persons in Ms. Groves's physical and psychological condition, (2) that she can provide or arrange to provide the supportive care Ms. Groves requires, and (3) that she is able to manage Ms. Groves's personal and real property in a competent manner. Should the trial court determine that none of Ms. Groves's family members are able to provide Ms. Groves the supervision, protection, and assistance she requires, the court may consider appointing a public guardian pursuant to Tenn. Code Ann. § 34-7-101 et seq. or another third-party to serve as Ms. Groves's conservator.

[114]Mr. Groves's briefs address only the purported gifts of real property and money. They do not address the trial court's decisions regarding Ms. Groves's furniture and other items of personal property or Mr. Groves's request for $18,000 to repay the allegedly outstanding balance of a $40,000 loan he made to R.C. Groves in 1964. Accordingly, we conclude that Mr. Groves and his wife have abandoned their appeal with regard to the portions of the final order directing them to return Ms. Groves's furniture and other items of personal property that may still be in their possession and denying their request for $18,000.

**A.**

This case began as an unremarkable conservatorship proceeding. Mr. Groves requested the trial court to appoint him conservator for his sister-in-law because she was no longer "capable of taking care of herself or her business affairs."[115] In the absence of evidence to the contrary, we presume that the petition was served upon Ms. Groves and that the trial court clerk notified her closest relatives as required by Tenn. Code Ann. § 34-1-106.

As required by Tenn. Code Ann. § 34-1-107(a), (b), the trial court appointed Timothy Barnes, a Clarksville lawyer, to be Ms. Groves's guardian ad litem. In the absence of evidence to the contrary, we presume that Mr. Barnes complied with his statutory obligation to meet with Ms. Groves for the purpose of explaining the nature of the proceedings and to advise her of her rights, including the right to contest the petition.[116] Tenn. Code Ann. § 34-1-107(d)(2)(C). Ms. Groves did not immediately contest her brother-in-law's petition.

Approximately one month after Mr. Groves filed his conservatorship petition, two of Ms. Groves's nieces, Mses. Travis and Proctor, filed a response to this petition and a counter-petition requesting the trial court to appoint them as their aunt's co-conservators.[117] Like Mr. Groves, Mses. Travis and Proctor alleged that Ms. Groves was "suffering from dementia complicated by a recent fall . . . her current judgment and insight are and have been impaired for several years, she is not now capable of taking care of herself or her business affairs, and that she is basically not competent." They also alleged that Mr. Groves could not be a fit conservator for Ms. Groves because he and his wife had "taken advantage of . . .[Ms. Groves] in her aged and weakened condition" and had "diverted" assets from her.

Competing conservatorship petitions, while infrequent, are entirely consistent with the conservatorship statutes. It should be expected that intra-family disagreements can arise regarding who should act as the conservator for an impaired family member. However, the petition filed by Mses. Travis and Proctor introduced a new issue into the proceeding. In addition to requesting to be appointed co-conservators for their aunt, Mses. Travis and Proctor requested the trial court to order Mr. Groves to account for Ms. Groves's real and personal property and to order Mr. Groves

---

[115]Mr. Groves clearly had standing to file this petition because he was a person with knowledge of Ms. Groves's circumstances as required by Tenn. Code Ann. § 34-3-102.

[116]A guardian ad litem's role and responsibilities are statutorily prescribed in some detail. Tenn. Code Ann. § 34-1-107(c), (d), (f). Trial courts should be extremely hesitant to use their prerogative under Tenn. Code Ann. § 34-1-121(a) to excuse guardians ad litem from any of their statutory responsibilities. While Mr. Barnes's performance as Ms. Groves's guardian ad litem is not directly at issue in this case, we note with some concern that the record does not reflect the steps Mr. Barnes took (1) to determine whether Mr. Groves or Ms. Travis would be appropriate conservators as required by Tenn. Code Ann. § 34-1-107(d)(2)(D), (2) to investigate Ms. Groves's physical and mental capabilities as required by Tenn. Code Ann. § 34-1-107(d)(3), or (3) to investigate Ms. Groves's finances, as well as Mr. Groves's and Ms. Travis's abilities to manage them as required by Tenn. Code Ann. § 34-1-107(d)(4). In addition, the record contains only an abbreviated written report prepared early in the proceeding that does not address many of the issues that Tenn. Code Ann. § 34-1-107(f) requires to be addressed.

[117]Like Mr. Groves, Mses. Travis and Proctor had standing to file their petition because they too had knowledge of Ms. Groves's circumstances as required by Tenn. Code Ann. § 34-3-102.

and his wife to return all the property that Ms. Groves and her late husband had turned over to them since 1995. These sorts of issues are not normally part of a conservatorship proceeding.[118]

Neither Ms. Groves nor her guardian ad litem responded to Mses. Travis's and Proctor's conservatorship petition. They neither ratified nor rejected it. Mr. Barnes never requested the trial court to appoint Ms. Groves an attorney ad litem pursuant to Tenn. Code Ann. § 34-1-125 to seek to set aside the gifts or to challenge the claims that she was so incapacitated that she required a conservator. For his part, Mr. Groves responded to the petition by denying that he and his wife had taken "unfair advantage" of Ms. Groves or that he and his wife should be required to return the real property, cash, and personal property they had received from Ms. Groves and her late husband. He also filed a counterclaim against Mses. Travis and Proctor seeking damages for abuse of process, defamation, and infliction of emotional distress.[119]

Approximately two weeks after Mses. Travis and Proctor filed their petition, Mr. Barnes filed a "report and answer." He reported that Ms. Groves "[s]uffered from dementia and other mental, psychological and physical problems" and recommended that a "conservator should be appointed as soon as practicable." He did not address (1) the nature or extent of Ms. Groves's property and finances, (2) the validity of the alleged gifts to Mr. Groves and his wife, or (3) the relative suitability of Mr. Groves, Ms. Travis, or Ms. Proctor to be Ms. Groves's conservator.

In December 1998, the lawyer who had been representing Mses. Travis and Proctor withdrew and was replaced by Thomas R. Meeks. The proceedings took another curious turn approximately six months later when Mr. Meeks, purporting to act as Ms. Groves's lawyer, filed a motion solely on Ms. Groves's behalf seeking the court's permission to move out of the Clarksville Manor Nursing Home. Addressing only Mr. Groves's petition, Ms. Groves asserted that she was "of sound mind," that she was suffering anxiety and stress by being forced to live in the nursing home, and that "she . . . [was] being kept in the nursing home by certain individuals who seek to gain undue advantage from the [m]ovant. Said individuals continue will [sic] to control her financial affairs so that they may receive same upon her death." Ms. Groves also asserted that she "would like to distance herself from the nursing home and initiate action to recover all property, including money from banks, that have [sic] wrongfully taken [sic] from her." In August 1999, Mr. Meeks filed another motion for Ms. Groves reiterating that "she [did] . . . not suffer from a mental illness that would incapacitate her to justify the appointment of a conservatorship [sic]" and that "there is no basis in law and fact that would justify and support a continuation of the conservatorship."[120]

_____

[118]A conservatorship proceeding, like a will contest, involves a single issue, the outcome of which may affect related proceedings in other courts. Because of the potentially far-reaching impact of the proceeding on a person's status, the better practice is to avoid using a conservatorship proceeding to litigate issues other than a person's capacity to manage his or her own personal and financial affairs. If a person is found to be sufficiently incapacitated to require a conservator, the trial court may empower the conservator to take steps to preserve the incapacitated person's real and personal property.

[119]These damage claims should likewise have been severed from the conservatorship proceeding.

[120]The circumstances surrounding the filing of these two motions are extremely perplexing. The medical affidavits that had already been filed raised substantial question regarding Ms. Groves's capacity to retain counsel. At

(continued...)

Mr. Groves and his wife responded to each of Ms. Groves's motions by providing letters from Drs. Stalford and Franklin stating that Ms. Groves had moderate to severe dementia, that she required "24 hour nursing care," and that removing Ms. Groves from the nursing home would be harmful to her. They also dismissed Ms. Groves's assertions regarding her capacity as products of her mental condition. Neither Mr. Barnes nor Ms. Travis[121] responded to Ms. Groves's assertions that she was not incapacitated and that she did not need a conservator.

Ms. Groves's motions should have provided a warning to the parties and the trial court that this proceeding was careening out of control. Until the motions were filed, all petitioning parties and the guardian ad litem had agreed that Ms. Groves was so incapacitated that she required a conservator. Their only disagreement involved who the conservator should be. Ms. Groves's petitions should have served notice to the parties and the trial court that Ms. Groves's incapacity was at issue.

Despite the protestations in Ms. Groves's motions, no other party – not Mr. Groves, not Mses. Travis and Proctor, and not Mr. Barnes – took the position that Ms. Groves had the functional and decision-making capacity required to care for herself, to manage her property and finances, and to make decisions regarding her medical care. Instead, the competing parties focused most of their energies on tearing into each other.[122] The guardian ad litem did not retreat from his assertion that Ms. Groves required a conservator but was either unable or unwilling to recommend who this conservator should be. Thus, the parties must have been somewhat surprised when the trial court ruled from the bench that Ms. Groves was not incapacitated and that she did not require a conservator for any purpose.

## B.

Mr. Groves insists that the trial court should not have ordered him to return the real property, cash, and personal property after it concluded that Ms. Groves is not incapacitated. He asserts that if Ms. Groves is not incapacitated, only she could request that the purported gifts be set aside and

---

[120](...continued)
the same time, the record contains no indication that Ms. Groves's guardian ad litem was aware that she had retained counsel or that the trial court had appointed Mr. Meeks as her attorney ad litem to contest the allegations of incapacity, found not only in Mr. Groves's petition but also in the petition filed by Mses. Travis and Proctor.

It is similarly unclear how Mr. Meeks could simultaneously represent both Ms. Groves and Mses. Travis and Proctor because their positions regarding Ms. Groves's capacity – judged by the papers filed on their behalf – were patently inconsistent and opposed. Mses. Travis and Proctor had alleged that Ms. Groves was suffering from dementia, that she was "basically not competent," and that she was "not now capable of taking care of herself or her business affairs." To the contrary, Ms. Groves was asserting that she was of sound mind and that she was not in need of a conservator.

[121]By this time, Ms. Proctor had removed herself as a party to this proceeding.

[122]The level of animosity between Mr. Groves and Ms. Travis increased as the litigation progressed. The strength of their vituperation is reflected in their lawyers' closing arguments. Mr. Groves's lawyer characterized Ms. Travis as "not truthful" and questioned her ability to care for Ms. Groves, as well as her motives for desiring to do so. Ms. Travis's lawyer characterized Mr. Groves as a "viper," a "deceitful, dishonest man," and a "spider waiting to crawl down a web and attack someone."

that the trial court should not have addressed the challenged gifts because Ms. Groves herself never challenged them.[123] Mr. Groves's standing argument has merit up to a point but will not carry the day in this case.

An action to set aside a gift may be brought by the donor during his or her lifetime or by the donor's heirs or personal representative following the donor's death. *See, e.g., Fritts v. Abbott*, 938 S.W.2d 420, 420 (Tenn. Ct. App. 1996) (suit by the personal representative of a deceased donor); *Haralson v. Haralson*, No. 85-209-II, 1985 WL 3860, at *1 (Tenn. Ct. App. Nov. 27, 1985) (No Tenn. R. App. P. 11 application filed) (suit by the donor's heirs); *Brown v. Weik*, 725 S.W.2d 938, 940 (Tenn. Ct. App. 1983) (suit by donor). If a donor is alive but incapacitated, the suit may be filed with the court's permission by the donor's conservator, next friend, or other legal representative. Under the facts of this case, once the trial court concluded that Ms. Groves was "competent," only Ms. Groves could undertake to set aside the purported gifts to Mr. Groves and his wife.

In the same fashion, a suit to rescind a deed may be filed by the grantor or by the grantor's guardian or conservator if the grantor is incapacitated. *York v. Georgia-Pacific Corp.*, 585 F. Supp. 1265, 1276-77 (D. Miss. 1984) (permitting suit by the grantor or his heirs); *Loftis v. Johnson*, 294 S.E.2d 511, 512 (Ga. 1982) (permitting suit by the grantor's guardian); *Schneider v. David*, 564 N.Y.S.2d 727, 728 (App. Div. 1991) (holding that an action to set aside a conveyance belongs only to the grantor as the party fraudulently induced); *Kuehn v. Kuehn*, 104 N.W.2d 138, 141 (Wis. 1960) (permitting action by the conservator of a living grantor). A third-party who is a stranger to the transaction cannot file suit to rescind a deed unless it can demonstrate an adverse effect on its legal or equitable rights. *ADCA Corp. v. Blumberg*, 403 So.2d 547, 547 (Fla. Dist. Ct. App. 1981); *City of Bluefield v. Taylor*, 365 S.E.2d 51, 55 (W. Va. 1987). Children or other members of a live grantor's family have no standing to file suit to rescind a deed because, as expectant heirs, they have no legal or equitable interest in the grantor's property. *Frady v. Irvin*, 264 S.E.2d 866, 869 (Ga. 1980); *Berger v. Berger*, 578 S.W.2d 547, 549 (Tex. Civ. App. 1979).

The trial court's decision that Ms. Groves was competent narrowed the class of persons with standing to seek to set aside the deeds conveying Ms. Groves's property to Mr. Groves and his wife. Ms. Groves herself, as the grantor, could certainly file suit to set the deed aside. However, Ms. Travis, as a stranger to the conveyance, could pursue rescission only if the conveyance affected her legal rights or interests. Even though she may have been one of Ms. Groves's heirs, Ms. Travis had no legally recognized interest in Ms. Groves's property during her lifetime. Accordingly, Ms. Travis lacked standing to seek rescission of the two deeds conveying Ms. Groves's real property to Mr. Groves and his wife.

Even though Mr. Groves has now correctly pointed out the consequences of the trial court's conclusion that Ms. Groves is not disabled, there are two reasons why he is not entitled to a reversal of the portion of the judgment directing him to return Ms. Groves's purported gifts. First, we have reversed the trial court's conclusion that Ms. Groves is not disabled and have determined that the

---

[123]For the purpose of this opinion, we will take as correct Mr. Groves's assertion that Ms. Groves never requested that the purported gifts be set aside. Even though Ms. Groves stated in her May 18, 1999 motion that she "would like to . . . . initiate action to recover all property . . . that have wrongfully taken [sic] from her," she never initiated this action as far as this record shows.

record contains clear and convincing evidence that Ms. Groves's functional and decision-making capacity is severely impaired and that a conservator should be appointed for her. Second, Mr. Groves did not object in the trial court to trying the issues regarding the purported gifts.

We have already concluded in Section II of this opinion that Ms. Groves's functional and decision-making capacity is severely impaired. Because of these impairments, the trial court should have appointed a conservator for her. In light of the dispute involving the purported gifts to Mr. Groves and his wife, the trial court should have specifically authorized Ms. Groves's conservator to ascertain whether these gifts were valid and to undertake to set them aside if they were not.

Instead of following this procedure, the trial court undertook to adjudicate the validity of the disputed gifts in the conservatorship proceeding. Mr. Groves and his wife had timely notice that these gifts were at issue and were given an adequate opportunity to present evidence to support their claim that the gifts were valid. As a result, the parties presented fully developed cases both in support of and in opposition to the validity of the gifts. Litigating these issues again would unnecessarily dissipate the resources of the parties and the court, as well as Ms. Groves's property. However, requiring a second trial would be the only appropriate remedy if the trial court lacked subject matter jurisdiction or if Mr. Groves and his wife had objected in a timely manner to the trial court's adjudicating these issues.

We have determined that the trial court had subject matter jurisdiction over the dispute regarding the purported gifts. The purpose of a conservatorship proceeding is to protect the person and property of persons whose functional and decision-making capacity has become impaired. *In re Conservatorship of Clayton*, 914 S.W.2d 84, 90 (Tenn. Ct. App. 1995). Upon a finding that a person's incapacity requires the appointment of a conservator, Tenn. Code Ann. § 16-11-108 (1994) vests the chancery court with jurisdiction over the incapacitated person's person and property. This jurisdiction is deeply rooted in the state's *parens patriae* power to serve as protector of incapacitated persons and to take all actions reasonably necessary to promote the incapacitated person's best interests. *In re Johnson*, 658 N.Y.S. 2d 780, 784 (N.Y. Sup. Ct. 1997); *see also In re Orshansky*, 804 A.2d 1077, 1103 (D.C. App. 2002); *In re Guardianship of Hedin*, 528 N.W.2d at 571.

It is the determination that a person is incapacitated enough to require a conservator that vests the trial court with jurisdiction over the person's property. Prior to this determination, adults are presumed to be fully capable of managing their affairs, and the courts cannot exercise direct control over their property. However, the trial court is not entirely powerless. In appropriate circumstances, it may exercise control over the incapacitated person's property indirectly by exerting its power over the persons over whom it has jurisdiction.[124]

The disputed property in this case was in the hands of Mr. Groves and his wife. Accordingly, upon a finding of incapacity, the trial court could have exercised control over the property because

---

[124]For example, upon a proper showing, a court may enjoin an allegedly incapacitated person who is the subject of a conservatorship proceeding from disposing of his or her property. Similarly, if the allegedly incapacitated person has conveyed property to another person over whom the trial court has personal jurisdiction, the court may order that person not to dispose of the property. However, the trial court cannot exercise similar control over property that the allegedly incapacitated person has conveyed to someone over whom the trial court does not have personal jurisdiction.

Mr. Groves and his wife were parties to the proceeding. In fact, the trial court did exercise control over the property by entering a restraining order preventing Mr. Groves and his wife from disposing of the property pending a final hearing. The record reflects that Mr. Groves and his wife recognized and acquiesced[125] in the trial court's control over their use of the property. Between September 1998 and December 1999, Mr. Groves filed five motions requesting the court's approval of various transactions involving the property. Accordingly, we find that had the trial court determined that Ms. Groves was incapacitated, it would have acquired jurisdiction over not only the property in her possession but also the property that she had transferred to Mr. Groves and his wife.

Mr. Groves and his wife did not object to the trial court's exercise of authority over them or the disputed property in their possession. Similarly, they did not object to litigating the validity of the purported gifts in the conservatorship proceeding. Parties cannot use non-jurisdictional errors committed during a trial as their "ace-in-the-hole" should the trial's outcome not be to their liking. *Davis v. State Dep't of Employment Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999); *Varley v. Varley*, 934 S.W.2d 659, 667 (Tenn. Ct. App. 1996). Accordingly, parties who fail to take the steps reasonably available to them to cure or mitigate the harmful effect of an error are not entitled to use this error to obtain relief on appeal. Tenn. R. App. P. 36(a); *In re Adoption of D.P.M.*, 90 S.W.3d 263, 266 (Tenn. Ct. App. 2002). Because Mr. Groves and his wife did not object during the proceedings below to the trial court's decision to address the issues regarding the disputed gifts, they cannot now take issue with this procedural misstep on appeal.

Appellate courts may grant complete relief to the parties as long as they have fair notice and a reasonable opportunity to be heard on the disputed issues. Tenn. R. App. P. 13(b), 36(a); *Realty Shop, Inc. v. RR Westminster Holding, Inc.*, 7 S.W.3d 581, 608 (Tenn. Ct. App. 1999). In this case, Mr. Groves and his wife had fair notice in the trial court that the validity of the purported gifts was at issue and introduced evidence designed to support their claim that these gifts were valid. They are the ones who have taken issue with the trial court's disposition of these gifts on appeal. They have provided a record of the proceeding and have fully briefed the issues. Accordingly, to prevent further needless litigation regarding the purported gifts, we have determined that we may address the issues Mr. Groves and his wife have raised regarding the trial court's decision to set these gifts aside. *See Heatherly v. Merrimack Mut. Fire Ins. Co.*, 43 S.W.3d 911, 916 (Tenn. Ct. App. 2000) (addressing an issue raised for the first time on appeal in order to prevent further needless litigation).

## C.

We turn now to the two deeds Ms. Groves executed in December 1997 conveying all her real property to Mr. Groves and his wife. Mr. Groves insists that these deeds were "true gifts that should not be revoked or rescinded." We have determined that the evidence does not preponderate against the trial court's conclusion that Mr. Groves had a confidential relationship with Ms. Groves when she executed these deeds and that Mr. Groves exerted undue influence upon Ms. Groves to obtain them.

---

[125]At one point, Mr. Groves filed a motion requesting the trial court to dissolve the order restricting his use of the property. However, the record contains no indication that the trial court ever heard or disposed of this motion. Most of the orders entered after Mr. Groves filed the motion were entered by agreement.

Ms. Groves and R. C. Groves began to rely more heavily on Mr. Groves after R. C. Groves became ill in early 1994. On the day he was admitted to a nursing home, R. C. Groves and Ms. Groves signed general powers of attorney giving Mr. Groves broad, unrestricted authority to act for them in financial matters. Following R. C. Groves's death in October 1995, Ms. Groves turned even more to Mr. Groves and his wife for assistance as she became less able to care for herself. After Ms. Groves fractured her spine, she was no longer able to live autonomously, and she was forced to move in with Mr. Groves and his wife in September 1998.

Mr. Groves and his wife actively discouraged other family members from visiting Ms. Groves after she moved into their house. In December 1998, three months after moving into her brother-in-law's house, Ms. Groves signed two quitclaim deeds prepared by Mr. Groves's lawyer conveying all her real property to Mr. Groves and his wife. The consideration for these deeds was "love and affection and other good and valuable consideration." Mr. Groves paid for the preparation of the deeds and recorded them the day after Ms. Groves signed them.

To be valid, a deed must be the result of the conscious, voluntary act of a grantor who has the capacity to transact business. *Cason v. Cason*, 116 Tenn. 173, 193-94, 93 S.W. 89, 94 (1905); *Fell v. Rambo*, 36 S.W.3d 837, 846 (Tenn. Ct. App. 2000). To have the capacity to transact business, a person need only be able to reasonably know and understand the nature, extent, character, and effect of the transaction. *Mays v. Prewett*, 98 Tenn. 474, 478, 40 S.W. 483, 484-85 (1897). However, a deed to a grantee who is in a confidential relationship with the grantor can be set aside if the grantee has exerted undue influence on the grantor to procure the deed. *Brown v. Weik*, 725 S.W.2d at 945.

In cases of this sort, any relationship between two persons in which one person is in a position to exercise dominion and control over the other will be considered to be a confidential relationship. *Childress v. Currie*, 74 S.W.3d at 328; *Robinson v. Robinson*, 517 S.W.2d 202, 206 (Tenn. Ct. App. 1974). The fact that one person has given another his or her general power of attorney is not necessarily evidence of a confidential relationship as long as the person receiving the power of attorney was not active in its procurement and has not exercised it. *Childress v. Currie*, 74 S.W.3d at 329.

Mr. Groves had possessed his sister-in-law's general power of attorney since April 1994 but had never exercised it. Thus, the existence of the power of attorney alone cannot establish the existence of a confidential relationship. There is, however, more than ample evidence to establish the existence of a confidential relationship between Ms. Groves and her brother-in-law and that Mr. Groves had dominated this relationship ever since R. C. Groves died in October 1995. By the time Ms. Groves executed the deeds in December 1998, she was completely dependent on Mr. Groves and his wife for her housing, sustenance, medical care, and other support. She was incapable of doing much other than basic personal hygiene without their assistance. Accordingly, the trial court did not err by concluding that Mr. Groves was the dominant party in a confidential relationship with Ms. Groves when she signed the deeds in December 1998.

The existence of a confidential relationship between the grantor and the grantee, by itself, does not warrant rescinding a deed. Thus, persons seeking to rescind a deed must prove the existence of other suspicious circumstances that would reasonably support a conclusion that the

grantor did not act freely and independently. These suspicious circumstances include, but are not limited to, the grantor's physical and mental deterioration and the grantee's active involvement in procuring the conveyance. The existence of a confidential relationship combined with a transaction benefitting the dominant party gives rise to a presumption that undue influence was exercised. This presumption effectively shifts the burden to the grantee to present clear and convincing evidence that the challenged conveyance was fair. *Fell v. Rambo*, 36 S.W.3d at 847-48.

These conveyances clearly benefitted Mr. Groves and his wife because they received real property worth between $60,000 and $65,000 for no monetary consideration. Mr. Groves actively procured these deeds, and as a result of the conveyances, Ms. Groves, the weaker, more dependent party, was left with essentially nothing. These circumstances were sufficient to shift the burden of going forward with the evidence to Mr. Groves to prove that the conveyance was fair.

The evidence Mr. Groves offered on this point is surprisingly weak. He testified that Ms. Groves simply decided to give him her real property, and the lawyer who prepared the deeds testified that Ms. Groves "appeared" to know what she was doing when she signed them. This evidence falls far short of establishing clearly and convincingly that these conveyances were fair and not the products of undue influence. Accordingly, we affirm the trial court's decision to set these conveyances aside.

### D.

Mr. Groves also asserts that the trial court erred by ordering him to return the remaining proceeds of the $100,000 certificate of deposit Ms. Groves and her late husband had maintained at the People's Bank in Dickson. He argues that the evidence supports his claim that this money was also a gift from Ms. Groves and her late husband. We respectfully disagree for two reasons. First, we find that the evidence supports the trial court's conclusion that Mr. Groves exerted undue influence on his brother and sister-in-law to obtain this money. Second, we find that public policy prevents Mr. Groves from keeping these funds because the purported gift was part of a fraudulent scheme to qualify Ms. Groves and her late husband for governmental benefits to which they were not entitled.

Mr. Groves's relationship with his brother and sister-in-law became a confidential relationship even before they gave him their unrestricted powers of attorney in April 1994. Prior to that time, Ms. Groves and her late husband had become physically disabled and were relying increasingly on Mr. Groves to assist them with their financial affairs. Ms. Groves's husband, who had always been in charge of their finances, had been hospitalized with a serious illness and was facing a lengthy and expensive stay in a nursing home. Accordingly, the evidence supports the trial court's conclusion that Mr. Groves was in a position to exert undue influence on both his brother and sister-in-law as early as March 1994.

Mr. Groves obtained the proceeds from the $100,000 certificate of deposit while his brother was still hospitalized and after his brother learned that he was going to be admitted to a nursing home. He took an active role in seeing to it that Ms. Groves surrendered the certificate of deposit and delivered the proceeds to him. This transaction substantially depleted his brother's and sister-in-law's life savings. There was no consideration for the transaction, and, according to Mr. Groves,

his brother and sister-in-law placed no restrictions on his use of the money.[126] However, Mr. Groves now claims that he told his brother that he "would keep it [the money] to have for them in case they needed it."

Receiving the proceeds of the $100,000 certificate of deposit substantially benefitted Mr. Groves. Even if we were to accredit his self-serving testimony that he planned to use this money to benefit his brother and sister-in-law, he did not anticipate being required to use much of these funds because the plan was to use government benefits to defray most of their expenses. In light of the nature of the relationship between Mr. Groves and his brother and sister-in-law when he received these funds, Mr. Groves had the burden of proving by clear and convincing evidence that this transaction was fair. *Childress v. Currie*, 74 S.W.3d at 328; *Fell v. Rambo*, 36 S.W.3d at 847-48. Rather than establishing the fairness of the transaction, Mr. Groves's testimony, taken with the other evidence in the case, establishes that the transaction was entirely unfair and was, in fact, fraudulent.

Within days after receiving the proceeds of his brother's and sister-in-law's $100,000 certificate of deposit, Mr. Groves orchestrated qualifying them for food stamps, Medicaid and TennCare. Ms. Groves and her late husband would not have been entitled to food stamps or TennCare benefits had they disclosed that they owned a $100,000 certificate of deposit because these programs have maximum income and asset eligibility requirements. Because both Ms. Groves and her late husband qualified for TennCare and Ms. Groves qualified for food stamps, we must assume that their applications for these benefits did not reveal the $100,000 certificate of deposit or the fact that they had "given" these funds to Mr. Groves only days before they filed their applications.

The federal and state statutes governing the Medicaid and TennCare programs anticipate that persons seeking benefits may attempt to pauperize themselves in order to qualify for benefits, and, therefore, they contain remedies for this sort of conduct when it is discovered. Persons applying for benefits must not only disclose the assets in their possession when they apply; they must also disclose any transfer of assets occurring within thirty-six months prior to the date of their application for benefits.[127] Any person who received benefits after failing to disclose a transfer of assets for less than fair market value occurring on or after the "look back" date is subject to a discontinuation of benefits for a statutorily-defined period,[128] and may also be subject to criminal prosecution if the failure to disclose the transfer is intentional.[129]

---

[126]According to Mr. Groves, his brother told him: "[H]ere's a check for you and you can take it and do whatever you want with it."

[127]42 U.S.C.A. § 1396p(c)(1)(B)(i) (West Supp. 2002) defines how an applicant's "look back" date is determined.

[128]42 U.S.C.A. § 1396p(c)(1)(E). For institutionalized persons, the number of months of ineligibility equals the total, cumulative uncompensated value of all assets transferred by the person on or after the "look back" date divided by the average cost to provide a private patient of nursing facility services in the state at the time of the application. 42 U.S.C.A. § 1396p(c)(1)(E)(i)(I-II).

[129]Tenn. Code Ann. § 71-5-118(b)(1)(A) (Supp. 2002).

In addition to these penalties, the TennCare statutes provide two civil remedies to recover wrongfully paid benefits from the recipient. Tenn. Code Ann. § 71-5-117(a) authorizes the Commissioner of Health to file suit against a living recipient to recover benefits "incorrectly" paid or to file suit against the recipient's estate if he or she has died. In addition, if the benefits were paid as a result of the recipient's misrepresentation, Tenn. Code Ann. § 71-5-118(i) authorized the Bureau of TennCare to initiate a contested case proceeding against the recipient to recover the "improperly" paid benefits, as well as attorney's fees and costs.

As a practical matter these civil remedies against the recipient will have little value if the recovery is limited to the assets the recipient currently has on hand. These recipients are essentially judgment-proof because their assets cannot exceed the maximum income and asset levels established by law. For these remedies to be effective, the government payors must have the ability to set aside wrongful conveyances. Other states permit government payors to use their debtor and creditor statutes to set aside allegedly fraudulent transfers in order to make the assets subject to a judgment for wrongfully paid benefits. *See, e.g., Alberico v. Health Mgmt. Sys., Inc.*, 5 P.3d 967, 970 (Colo. Ct. App. 2000); *Crabb v. Estate of Mager*, 412 N.Y.S.2d 508, 510 (App. Div. 1979).

Improperly or incorrectly paid TennCare benefits are "debts due the state." Tenn. Code Ann. § 71-5-117(a). Accordingly, the State, having paid benefits to which the recipient is not entitled, is a "creditor" as defined in Tenn. Code Ann. § 66-3-301(3) (1993). Because the State is a creditor, the Bureau of TennCare and the Commissioner of Health may invoke Tennessee's fraudulent conveyance statutes to set conveyances aside if they were made for the purpose of qualifying the recipient for benefits. Pursuant to Tenn. Code Ann. § 66-3-308 (1993), the courts may set aside any conveyance a recipient of benefits made on or after his or her look-back date if the Bureau or the Commissioner proves that the conveyance was made with an intent to defraud TennCare by obtaining benefits to which the recipient would not otherwise have been entitled.

Conveyances or gifts made with an intent to delay, hinder, or defraud a creditor are "clearly and utterly void." Tenn. Code Ann. § 66-3-101 (1993). The evidence in this record supports the trial court's following three conclusions:

> a deposit of $100,000 in a bank account would disqualify R. C. Groves [and Ms. Groves] from federal subsidies such as food stamps and Medicaid,
>
> * * *
>
> R. C. Groves may not have wanted to have seen he [sic] and his wife's $100,000 deposit dissipated by a nursing home, and he may have decided to transfer those assets out of he [sic] and his wife's names in order to qualify for federal subsidies,
>
> * * *
>
> the monies owned by R. C. Groves and Ellen P. Groves was [sic] taken out of the bank in order to qualify R. C. Groves and Ellen P.

-34-

Groves for food stamps and [M]edicaid . . ..  The Court is of the opinion that R. C. Groves and Ellen P. Groves received these benefits . . . because they had no substantial monies on deposit at a bank in their names at the time of their application for said benefits.

In light of Mr. Groves's role in promoting his brother's and sister-in-law's applications for food stamps and TennCare, the evidence also suggests that Mr. Groves was privy to R. C. Groves's plan and assisted him in accomplishing the transfer of funds.  In fact, given R. C. Groves's physical circumstances at the time, the transfer could not have occurred without Mr. Groves's assistance.

We have concluded that the record contains clear and convincing evidence that Mr. Groves was a party, along with his brother, to a conveyance undertaken for the sole purpose of enabling R. C. Groves and Ms. Groves to qualify for governmental assistance to which they would not otherwise have been entitled.  Because of the fraudulent character of this conveyance and his role in it, Mr. Groves is not entitled to gain personally from the transfer of funds by being permitted to retain the money.  Accordingly, the trial court did not err by ordering him to return the unspent remainder of the $100,000 certificate of deposit.

Setting aside this transaction and directing Mr. Groves to return the remainder of the proceeds of the $100,000 certificate of deposit does not necessarily result in returning these funds to Ms. Groves.  The State has a colorable claim to these funds because of the expenditures it has made on behalf of Ms. Groves and her late husband.  Accordingly, now that the funds are under the trial court's jurisdiction, the court should notify the Bureau of TennCare of these proceedings and provide the Bureau with a reasonable opportunity to commence a judicial or administrative proceeding to recover the payments either incorrectly or improperly paid.[130]

## E.

As a final matter, we turn to the $21,075.34 in cash and old coins that R. C. Groves kept in his house before he died.  Ms. Smith, one of Ms. Groves's neighbors, held these funds at R. C. Groves's request until October 11, 1995, when she returned them to Ms. Groves.  Mr. Groves asserts that his sister-in-law gave him the money outright soon after she received it.

The circumstances surrounding this purported gift bear all the earmarks of undue influence and breach of a confidential relationship.  Mr. Groves plainly had a confidential relationship with Ms. Groves at the time because he possessed her general power of attorney and because of her heightened dependence on him to take care of her financial matters.  At this particular time, she was even more dependent on Mr. Groves because her husband had just died.  Because the transaction benefitted Mr. Groves, he had the burden of presenting clear and convincing evidence that the

---

[130]The State need not file suit to set aside the conveyance as fraudulent because the decision to invalidate the gift has the same legal effect.  It would appear that the State may either file suit in accordance with Tenn. Code Ann. § 71-5-117(a) or commence a contested case proceeding pursuant to Tenn. Code Ann. § 71-5-118(i) to recover the benefits paid on behalf of Ms. Groves and her late husband.

transaction was fair. He presented no such evidence. Accordingly, we affirm the portion of the trial court's order directing Mr. Groves to account for these funds and to return them to Ms. Groves.[131]

## IV.
### MR. GROVES'S DEMAND FOR COMPENSATION

As a final matter, Mr. Groves asserts that the trial court erred by refusing to compensate him for the "time, energy and money" he expended caring for Ms. Groves after her late husband died. He insists that it would be "unconscionable" not to pay him $60 per day for the 161 days Ms. Groves lived with him before she was placed in a nursing home, $40 per visit for the 181 visits he and his family made to Ms. Groves's home before she moved into his house, and $5,660 for take-out food he allegedly provided Ms. Groves. Mr. Groves's claim for $22,560 suffers from two fatal defects. First, he provided no evidence that Ms. Groves agreed to pay him for these services or understood that he expected to be paid for these services. Second, he presented no evidence establishing the value of these services.

Family members are generally precluded from recovering for services provided to their close relatives because the law presumes that these services were gratuitous. *Gorrell v. Taylor*, 107 Tenn. 568, 570, 64 S.W. 888, 888 (1901); *Estate of Cleveland v. Gorden*, 837 S.W.2d 68, 71 (Tenn. Ct. App. 1992). This presumption is based on the recognition that

> family life abounds in acts of reciprocal kindness which tend to promote the comfort and convenience of the family, and that the introduction of commercial considerations into the relations of persons so closely bound together would expel this spirit of mutual beneficence and to that extent mar the family unity.

*Key v. Harris*, 116 Tenn. 161, 171, 92 S.W. 235, 237 (1905). The presumption is rebuttable, and so family members may obtain compensation for their services if they prove either that their relative agreed to pay for the services or that the services were provided under circumstances reflecting that the relative receiving the services knew that the relative providing them expected to be paid. *In re Estate of Hicks*, 510 S.W.2d 263, 265 (Tenn. Ct. App. 1972); *Cotton v. Estate of Roberts*, 47 Tenn. App. 277, 285-86, 337 S.W.2d 776, 780 (1960). The family member seeking compensation must also establish either the amount of expenditures actually made on the relative's behalf or the reasonable value of the services rendered. *See Bokor v. Holder*, 722 S.W.2d 676, 681 (Tenn. Ct. App. 1986).

Mr. Groves's evidence fails on both counts. He presented no evidence that Ms. Groves ever agreed to compensate him for the assistance that he and his family provided after her husband

---

[131]These funds may likewise be subject to any claim the State may make to recover benefits paid on behalf of Ms. Groves and her late husband.

-36-

died.[132]  By the same token, the circumstances of this case are not so extraordinary that we should impute to Ms. Groves an understanding that her brother-in-law and his family expected to be paid for their kindnesses to her.[133]  Thus, Mr. Groves has produced no evidence of an express or implied contract to compensate him.  Even if he had, he provided no credible substantiation for the $60 per day charge for keeping Ms. Groves in his home, the $40 per visit charge for visiting her, or the $5,660 he claims to have spent buying food for Ms. Groves before she moved into his house.  Accordingly, we affirm the portion of the trial court's order denying Mr. Groves's claim to compensation.

## V.

We affirm the portions of the final order that (1) set aside the purported gifts to Mr. Groves and his wife, (2) direct Mr. Groves to submit a full accounting of the money and real and personal property he received from Ms. Groves and her late husband, (3) direct Mr. Groves and his wife to reconvey Ms. Groves's real property to her, and (4) deny Mr. Groves's claim for compensation for the services he and his family provided Ms. Groves after October 1995.  We vacate the portions of the final order finding that Ms. Groves was not incapacitated and that she was capable of signing a last will and testament.  Based upon our conclusion that Ms. Groves's functional and decision-making capacity are severely impaired, we remand the case with directions to conduct a hearing consistent with this opinion and to enter an order appointing a conservator or conservators for Ms. Groves and specifically defining their duties and responsibilities.[134]  We also tax the costs of this appeal to Glendon P. Groves and Wilmuth Groves and their surety for which execution, if necessary, may issue.

_____
WILLIAM C. KOCH, JR., JUDGE

---

[132]Mr. Groves did not testify that he ever asked Ms. Groves for compensation for the services that he and his wife provided her after R. C. Groves died.  In fact, he never testified that he and Ms. Groves even discussed the matter. The only discussions Mr. Groves testified about were his conversations with R. C. Groves in March and April 1994 involving the $100,000 certificate of deposit.  While Mr. Groves's various accounts of these discussions are somewhat inconsistent, the essence of his testimony is that R. C. Groves and his wife gave him the money "to do whatever you want with it."  While Mr. Groves may have intended to use part of these funds to help his brother and sister-in-law, he never testified that they gave him the money either in return for his promise to use it to take care of them or in payment for the future services he would be providing to either or both of them.

[133]Mr. Groves did not move out of his house or interrupt his job in order to care for Ms. Groves.

[134]The court should specifically authorize Ms. Groves's conservator to determine whether grounds exist to set aside the two wills Ms. Groves executed after her husband's death and to take steps to invalidate either or both of these wills if there are grounds to do so.